UNITED STATES of America,
Plaintiff–Appellee,

v.

Douglas NYHUIS, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Anicia Marivel RIPOLL, a/k/a Anicia Goodman, Defendant–Appellant.

Nos. 91–3628, 91–3629.

United States Court of Appeals,
Eleventh Circuit.

Dec. 2, 1993.

732

B. Robert Ohle, St. Petersburg, FL, and Stephen J. Bronis, Miami, FL, for defendants-appellants.

Robert W. Genzman, Rick Jancha, U.S. Attys., Orlando, FL, Karla Spaulding, and David P. Rhodes, Asst. U.S. Attys., Tampa, FL, for plaintiff-appellee.

Before EDMONDSON and CARNES, Circuit Judges, and HILL, Senior Circuit Judge.

CARNES, Circuit Judge:

After a joint trial, Douglas Nyhuis and Anicia Goodman appeal their convictions and sentences which resulted from their involvement in a cocaine importation and distribution conspiracy operating inside and outside the United States. Nyhuis was convicted on one count of conspiracy to possess with intent to distribute and to distribute greater than five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Goodman was convicted on one count of aiding and abetting the importation of 1500 kilograms of cocaine in violation of 21 U.S.C. §§ 963 and 960(b)(1)(B).

Between them, Nyhuis and Goodman raise seven issues, four of which warrant no dis-

cussion. The three issues that do warrant discussion are: 1) Nyhuis's contention that the district court erred in denying his motion to dismiss the indictment returned in the Middle District of Florida on grounds that he was being prosecuted and punished a second time for the same offense in violation of the Double Jeopardy Clause, the first time having been a conviction and sentence in the Western District of Michigan for operating a continuing criminal enterprise; 2) Nyhuis's contention that the district court erred in denying his motion to dismiss the Florida indictment on the grounds that the prosecution violated the terms of immunity he had been granted after his Michigan plea agreement; and 3) Goodman's contention that the district court erroneously considered her extraneous criminal conduct in concluding that her role in this crime was that of an "organizer or leader" under U.S.S.G. § 3B1.1(a).[1] We will discuss these three contentions in the order stated, and conclude that the convictions and sentences of Nyhuis and Goodman are due to be affirmed.

## I. NYHUIS'S DOUBLE JEOPARDY CLAIMS

Under a Michigan indictment, Nyhuis was convicted of being a member of a continuing criminal enterprise (CCE) involving the distribution of marijuana. Under the Florida indictment in this case, he was convicted of conspiracy to distribute cocaine. Nyhuis contends that the Michigan and Florida activities were simply two parts of the same conspiracy that existed throughout the entire period of 1983 to 1989, and that he has been convicted twice for his involvement in this single conspiracy. To support this contention, Nyhuis argues that the source of the marijuana and the cocaine was the same throughout the conspiracy and that many of

1. The four contentions we reject without further discussion are Goodman's arguments that the district court: 1) abused its discretion in refusing to grant her a four hour continuance to allow retained counsel to be present for trial; 2) erred in granting the Government's Fed.R.Crim.P. 13 motion jointly to try her indictment with an indictment charging other defendants with a drug importation conspiracy; 3) abused its discretion in admitting collateral acts evidence con-

cerning Goodman and her husband as "inextricably intertwined," or as "other crimes" evidence, or both, in violation of Fed.R.Evid. 403 and 404(b); and 4) erred in denying her motion for judgment of acquittal because the Government failed to present sufficient evidence at trial to support the jury's verdict. Nyhuis raises only two contentions, both of which we discuss in the text above.

the parties involved in the marijuana CCE were also involved in the conspiracy to distribute cocaine. According to Nyhuis, the Government's use of evidence of his marijuana distribution activities in its Florida cocaine case lends further support for his contention. Nyhuis also argues that because conspiracy is a lesser included offense of CCE, the Florida cocaine conspiracy charge merges into the Michigan marijuana CCE conviction so that separate convictions for the two are barred by the Double Jeopardy Clause. Nyhuis also raises a multiple punishment challenge, contending that because the district court in Michigan considered Nyhuis's involvement in the cocaine conspiracy when it fashioned his sentence for the marijuana CCE conviction, he has been punished twice for this conduct.

## A. THE FACTS

### 1. Nyhuis's Michigan Prosecution For Marijuana Activities

From 1983 to 1989, Nyhuis was involved in marijuana distribution in the Western District of Michigan. In the Michigan operation, Nyhuis was essentially a wholesaler who received shipments of marijuana from Florida and then allocated the goods to his retail distributors. Sometime in 1984, Nyhuis began obtaining his marijuana supply from Florida drug kingpin George Marian through a mutual friend, James Muth. After the Marian marijuana supply line dried up in 1985, Muth continued to supply Nyhuis through the use of sources other than the Marian organization.

Two counts of a twenty-six count indictment returned in the Western District of Michigan in December of 1989 charged Nyhuis with: conspiracy to distribute and possess with intent to distribute marijuana (count one); and operation of a continuing criminal enterprise ("CCE") involving marijuana between January 1985 and October 1987 (count twenty-six). Various counts of the indictment also charged nineteen others, including James Muth; however, George Marian was not named in the indictment. The object of the conspiracy was "to make money from the unlawful distribution and sale of

marihuana," with the alleged overt acts occurring principally in Michigan and Florida.

Pursuant to a plea agreement executed on December 13, 1989, Nyhuis pleaded guilty to the CCE count, and the conspiracy count against him was dismissed. Under the terms of the agreement, the Government committed to making a recommendation of a ten-year sentence for Nyhuis. The plea agreement also contained the following clause:

The government agrees not to bring additional criminal charges against the defendant in the Western District of Michigan arising out of his involvement in the distribution of marijuana and those transactions disclosed by the defendant in the proffer already made to the government.

The day after the agreement was executed, Nyhuis testified before a Michigan grand jury. Unfortunately for Nyhuis, he elected to conceal from the Government and the grand jury both his involvement in the cocaine trade and his relationship with George Marian. The Government independently developed evidence that indicated that Nyhuis had been less than candid with the Government and in his grand jury testimony. As a consequence, Nyhuis's plea agreement was renegotiated upward to include a fifteen-year sentence recommendation. The Government did not seek a superseding indictment to incorporate Nyhuis's cocaine activities, and the Michigan district court granted a defense motion *in limine* prohibiting Nyhuis from being asked about his cocaine activities in his testimony at the trial of his codefendants in Michigan. After being fully informed of Nyhuis's criminal activities—both marijuana and cocaine—the district court in Michigan in July of 1990 sentenced Nyhuis to fourteen years in prison. Two days after his sentencing, Nyhuis again testified before a Michigan grand jury and this time he gave a full account of his marijuana and cocaine dealings with George Marian and others.

### 2. Nyhuis's Florida Prosecution For Cocaine Activities

In December of 1990, in the Middle District of Florida, an indictment was returned against twenty-three defendants, including Nyhuis and drug kingpin George Marian, for

conduct relating to the importation and distribution of cocaine that had occurred from March 1985 through October 1989. Marian himself was charged with operating a CCE for the importation and distribution of cocaine. Nyhuis, named in only one count of the twenty-one count indictment, was charged with conspiring with George Marian and others to possess with intent to distribute and to distribute in excess of 5 kilograms of cocaine hydrochloride. The objects of the conspiracy included possession with intent to distribute and distribution of large quantities of cocaine outside the United States and inside, including within "Florida, Michigan, California, Washington, and elsewhere." The overt acts section of that count specifically charged that in March of 1989 Nyhuis sent a courier from Michigan to pick up cocaine from George Marian in Florida and deliver it to Nyhuis in Michigan. It also charged that in July or August of 1989, Nyhuis facilitated a transaction involving the purchase of cocaine from George Marian in Florida and its transportation to Michigan.

The three key witnesses who testified against Nyhuis at the Florida trial were George Marian and Nyhuis's two cocaine couriers. Marian testified that Nyhuis contacted him in March of 1989 to reestablish their drug trafficking relationship. Marian also stated that he agreed to obtain for Nyhuis "small amount[s]" of cocaine in one kilogram installments. In addition, the two couriers employed by Nyhuis also testified regarding Nyhuis's conduct in connection with the two overt acts in which Nyhuis was named. Nyhuis was convicted of conspiracy to possess with intent to distribute and conspiracy to distribute cocaine.

## B.  DOUBLE JEOPARDY ANALYSIS AFTER *DIXON*

"The Double Jeopardy Clause affords the defendant three basic protections. The Clause protects against a second prosecution for the same offense after acquittal, against a second prosecution for the same offense after conviction, and against multiple punishments for the same offense." *United States v. Cochran*, 883 F.2d 1012, 1016 (11th Cir.1989).

"A denial of a motion to dismiss based on double jeopardy grounds is ... a question of law, [and] a district court's double jeopardy ruling is subject to *de novo* review by the appellate court." *United States v. Benefield*, 874 F.2d 1503, 1505 (11th Cir.1989). We have also observed that "[w]hen a defendant moves to dismiss an indictment on double jeopardy grounds, it is undisputed that he bears the burden of making a prima facie nonfrivolous claim." *Id.*. Once this threshold is crossed, "the government must prove by a preponderance of the evidence that the two indictments charge separate crimes." *Id.* Where the defendant is charged with multiple conspiracies, "the determination as to whether the government can prosecute a defendant for more than one conspiracy turns on whether there exists more than one unlawful agreement." *Id.*

This case was briefed and argued before the Supreme Court's decision in *United States v. Dixon*, —— U.S. ——, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993). In *Dixon*, the Court reaffirmed the "same-elements test" drawn from its decision in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932): "In both the multiple punishment and multiple prosecution contexts, this Court has concluded that where the two offenses for which the defendant is punished or tried cannot survive the 'same-elements' test, the double jeopardy bar applies." *Dixon*, —— U.S. at ——, 113 S.Ct. at 2856, 125 L.Ed.2d at 568. Because it concluded "that at least some of the counts at issue [in *Dixon* were] not barred by the *Blockburger* test," *id.* at ——, 113 S.Ct. at 2859, 125 L.Ed.2d at 572, the Court went on to consider whether those counts were barred by the "new, additional double jeopardy test" announced in *Grady v. Corbin*, 495 U.S. 508, 510, 110 S.Ct. 2084, 2093, 109 L.Ed.2d 548, 557 (1990). *Id.* In attempting to apply *Grady*, the Court "encountered ... yet another situation in which the pre-*Grady* understanding of the Double Jeopardy Clause allows a second trial, though the 'same-conduct' test would not...." *Id.* at ——, 113 S.Ct. at 2864, 125 L.Ed.2d at 577. "[B]ecause *Grady* contradicted an 'unbroken line of decisions,' contained 'less than accurate' historical analysis, and has produced

'confusion,'" the Court admitted that *Grady* "was a mistake," and accepted the Government's invitation to overrule it. *Id.* at ——, 113 S.Ct. at 2864, 125 L.Ed.2d at 577–78.

When the present case was argued, we could only state that our double jeopardy inquiry must begin with *Blockburger*'s "same-elements test." Because *Dixon* eliminated the *Grady* "same-conduct" test, the *Blockburger* test will normally be the only inquiry required when a court is confronted with a double jeopardy attack. As the Supreme Court reiterated in *Dixon, Blockburger* "inquires whether each offense contains an element not contained in the other...." *Dixon,* —— U.S. at ——, 113 S.Ct. at 2856, 125 L.Ed.2d at 568.

### C. NYHUIS'S MULTIPLE PROSECUTION CLAIM

#### 1. Double Jeopardy Analysis In The Context Of Consecutive CCE And Conspiracy Charges

■ Applying *Blockburger,* we normally would compare the elements of the CCE offense to which Nyhuis pled guilty in Michigan with the 21 U.S.C. § 846 conspiracy charge on which Nyhuis was convicted in Florida.[2] However, the interplay between the CCE statute[3] and the various conspiracy statutes requires a different approach. This is so because, as the former Fifth Circuit has held:

A double jeopardy defense will lie where the government has previously prosecuted

a defendant under either § 846 [conspiracy] or § 848 [CCE] and then seeks to prosecute him again on the basis of the same criminal agreement under the other statute. "Whatever the sequence may be, the Fifth Amendment forbids successive prosecution and cumulative punishment for a greater and lesser included offense."

*United States v. Stricklin,* 591 F.2d 1112, 1123 (5th Cir.) (quoting *Brown v. Ohio,* 432 U.S. 161, 169, 97 S.Ct. 2221, 2227, 53 L.Ed.2d 187 (1977)), *cert. denied,* 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979); *see also United States v. Graziano,* 710 F.2d 691, 699 (11th Cir.1983) (A "§ 846 offense of conspiracy is a lesser-included offense of the § 848 offense of engaging in a continuing criminal enterprise."), *cert. denied,* 466 U.S. 937, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984). However, as the *Stricklin* court made clear:

The attachment of jeopardy to one conspiracy prosecution under § 846 does not insulate a defendant from prosecution for conducting a continuing criminal enterprise in violation of § 848 if the government has evidence of a *separate conspiracy* with which to satisfy the "in concert" element of § 848.

*Stricklin,* 591 F.2d at 1124 (emphasis added).

*Stricklin* requires that we first examine the record to determine if Nyhuis has made a prima facie showing that the events charged in the Michigan indictment and those charged in the Florida indictment were part of a single conspiracy. *Id.* at 1122; *see also United States v. Benefield,* 874 F.2d 1503,

---

**2.** We may disregard the § 846 conspiracy charge in the Michigan indictment which was dismissed pursuant to Nyhuis's plea agreement because jeopardy did not attach to that dismissed charge. *Cf. United States v. Baggett,* 901 F.2d 1546, 1550 (11th Cir.) (holding that "the double jeopardy clause [does not] bar[] prosecution for counts dismissed as a result of a subsequently withdrawn plea bargain"), *cert. denied,* 498 U.S. 862, 111 S.Ct. 168, 112 L.Ed.2d 133 (1990); *see also United States v. Soto–Alvarez,* 958 F.2d 473, 482 n. 7 (1st Cir.) ("[J]eopardy ordinarily does not attach to counts which are dismissed and on which no finding of guilty is made."), *cert. denied,* —— U.S. ——, 113 S.Ct. 221, 121 L.Ed.2d 159 (1992).

**3.** Continuing Criminal Enterprise is defined as follows:

For the purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if—
(1) he violates any provision of this subchapter [21 U.S.C. §§ 801–904] or subchapter II of this chapter [21 U.S.C. §§ 951–971] the punishment for which is a felony, and
(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter—
(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
(B) from which such person obtains substantial income or resources.
21 U.S.C. § 848(c).

1505 (11th Cir.1989). As we noted in *Benefield*, the former Fifth Circuit "underscored the difficulty in identifying the parameters of section 846 conspiracies" in its decision in *United States v. Marable*, 578 F.2d 151, 154 (5th Cir.1978). *Benefield*, 874 F.2d at 1506. "[B]ecause a section 846 indictment may be tightly drawn, the court must look to the record to determine whether constituent elements of the two conspiracies charged indicate that the government has twice placed the defendant in jeopardy." *Marable*, 578 F.2d at 154; *see also Benefield*, 874 F.2d at 1506. To facilitate this inquiry, the *Marable* court announced a set of factors to guide the examination of the record:

> (1) time, (2) persons acting as co-conspirators, (3) the statutory offenses charged in the indictments, (4) the overt acts charged by the government or any other description of the offense charged which indicates the nature and scope of the activity which the government sought to punish in each case, and (5) places where the events alleged as part of the conspiracy took place.

*Marable*, 578 F.2d at 154; *see also Benefield*, 874 F.2d at 1506. Other circuits have applied these same "*Marable* factors." *See, e.g., United States v. Gomez–Pabon*, 911 F.2d 847, 860–61 (1st Cir.1990), *cert. denied*, 498 U.S. 1074, 111 S.Ct. 801, 112 L.Ed.2d 862 (1991); *United States v. Tanner*, 860 F.2d 864, 866–67 (8th Cir.1988), *cert. denied*, 498 U.S. 844, 111 S.Ct. 125, 112 L.Ed.2d 93 (1990). Although the Government suggests that "[a]nother factor often used is whether the two conspiracies depend on each other for success," that factor has not been adopted in this Circuit.

## 2. Application Of The *Marable* Factors

### a. Time

■ The Michigan indictment alleged a time frame running from December of 1983 through October of 1987. In this Florida case, the time frame ran from "at least" March of 1985 through October of 1989. According to the Florida indictment, Nyhuis's involvement in the cocaine enterprise occurred in 1989. The mere fact that there is some overlap in the time frames alleged does not mean that the two indictments involve the same conspiracy. *United States v. Tanner*, 860 F.2d 864, 866 (8th Cir.1988), *cert. denied*, 498 U.S. 844, 111 S.Ct. 125, 112 L.Ed.2d 93 (1990). On the other hand, "[t]he commission of crimes at different times does not necessarily prove that the crimes were carried out pursuant to more than one agreement." *Benefield*, 874 F.2d at 1505.

. Nyhuis testified in the trial of his codefendants in Michigan that while he was involved in the purchase and sale of marijuana from at least 1983 he did not meet George Marian until 1985. Nyhuis also stated that during his early involvement in the marijuana trade, his supplier was Michigan codefendant John Campau. When Campau went to prison in 1984, Nyhuis continued to receive his supply from Campau's sources through James and Kathy Dabbous, also codefendants in Michigan. During this period, Nyhuis did not know the identities of these sources. Thus, Nyhuis's marijuana distribution activities commenced before he became directly involved with George Marian in 1985.

Nyhuis's marijuana activities also survived a change in the Marian organization that took that organization out of the marijuana distribution business in mid–1985. During the trial of this case, Michael Shanley, an associate of George Marian, testified that before mid–1985, Marian was engaged in the marijuana distribution business, but at that time, Marian "moved on to a different aspect of the drug business, which was drug smuggling importation." Shanley also noted that with the shift in focus of the Marian organization came a change in product from marijuana to cocaine. According to Shanley, there was a "clear break" between the earlier marijuana distribution business and the later cocaine importation enterprise. Testimony of one of Nyhuis's Michigan codefendants, James Muth, indicated that after the Marian supply line dried up in 1985, Nyhuis looked to Muth as his source of supply for marijuana. Marian himself testified that he "kind of lost contact with Doug [Nyhuis] a couple of years there." Marian added that it was not until 1989 that he and Nyhuis met, at the initiative of Nyhuis, to discuss the possibility of his supplying Nyhuis with small amounts of cocaine. Thus, while there was some over-

lap in the times alleged in the two indictments, Nyhuis's Michigan organization existed as an independent economic entity both before and after any involvement with George Marian and his Florida-based operation. Thus, this time factor weighs against Nyhuis.

### b. Co–Conspirators

The second *Marable* factor is the extent to which there is an overlap of co-conspirators. This Court observed in *Benefield* that "the fact that a conspiracy must take on additional members to accomplish one of its objectives does not in itself establish a different conspiracy." 874 F.2d at 1507; *see also United States v. Nichols*, 741 F.2d 767, 772 (5th Cir.1984) ("A mere shuffling of personnel in an otherwise on-going operation with an apparent continuity will not, alone, suffice to create multiple conspiracies."), *cert. denied*, 469 U.S. 1214, 105 S.Ct. 1186, 84 L.Ed.2d 333 (1985). The Government asserts, however, that this is not a case of a continuous agreement with intermittent changes in personnel: "With the exception of the defendant [Nyhuis], the cast of characters actually charged in Florida is wholly different from those [sic] indicted in Michigan." Nyhuis concedes that he was the only conspirator named in both indictments but counters that the Government's primary witnesses in this Florida case—Mark DeVries and James Muth—were both named in the Michigan indictment. In addition, George Marian and witness Michael Shanley were named as possible coconspirators in a bill of particulars issued in the Michigan case.

Based on our review of the record and the indictments at issue, Nyhuis' argument, though not without some appeal, ignores far too much. First, there is the virtually absolute dissimilarity between the defendants charged in the Michigan and Florida cases. These people moved in different, albeit equally shady, worlds and what they had in common was a connection to George Marian. Even if we indulge the unsupported notion that Marian played a more prominent role in the Michigan conspiracy than merely being one of its suppliers, it would still be possible for us to find separate conspiracies because, as the Second Circuit has observed, "[s]epa-

rate chains of conspiracy may emanate from the same leadership." *United States v. Reiter*, 848 F.2d 336, 341 (2d Cir.1988). Second, Nyhuis' relationship to the coconspirators in Michigan was that of a leader and organizer, while his role in Florida was far more modest. If Nyhuis was truly a lieutenant in one massive Marian enterprise, his responsibility in the Florida scheme would have been greater than is averred in the Florida indictment and established at trial. Third, with a few notable exceptions (Marian, Muth, and DeVries), the Government could not have charged most of the Florida defendants in the Michigan case, nor could it have charged most of the Michigan defendants in the Florida case. This is not a case of "tak[ing] on additional members to accomplish one of [the conspiracy's] objectives," or of a "mere shuffling of personnel in an otherwise on-going operation." Instead, the casts of characters in the two conspiracies are almost entirely different. Thus, this factor weighs against Nyhuis also.

### c. Statutory Offenses Charged

The third *Marable* factor is the statutory offenses charged in the two indictments. The Michigan indictment alleged that Nyhuis operated a continuing criminal enterprise in violation of 21 U.S.C. § 848. In addition, both the Michigan indictment and the Florida indictment charged Nyhuis with the identical statutory offense—a violation of 21 U.S.C. § 846, conspiracy to distribute and possess with intent to distribute a controlled substance. Thus, this factor weighs in Nyhuis' favor.

### d. Overt Acts Charged

The fourth *Marable* factor is the overt acts charged in the two indictments which indicate the nature and scope of the activity the Government sought to punish in each case. Nyhuis concedes that "[t]he overt acts charged in the Michigan Indictment deal with marijuana and the overt acts charged in the Florida Indictment deal with cocaine," but he argues that "the actual facts that the Government set out to establish at the Florida trial included a great deal of evidence regarding Appellant's marijuana transac-

tions." The Government acknowledges that in this Florida case it did offer evidence regarding Nyhuis's marijuana activities in Michigan, but contends this was entirely proper—under Fed.R.Evid. 404(b) and the "inextricably intertwined" doctrine—where the "sole purpose[s]" of the evidence was to establish Nyhuis's intent in the Florida case and to explain the background of the crime charged.

Comparison of the overt acts alleged in the two indictments shows that they are dissimilar. The typical overt act alleged in the Michigan indictment was the interstate transportation of marijuana from Florida to Michigan. In the Florida indictment, the typical act is the maritime importation of cocaine from points outside the United States. Thus, this factor weighs against Nyhuis.

### e. Location

The Michigan indictment alleged marijuana activities in the Western District of Michigan and in Florida. The Florida indictment alleged criminal conduct in Florida, Michigan, California, Washington, and offshore. Nyhuis makes a great deal of this locale overlap. However, review of the Florida indictment reveals that the only Michigan-based conduct alleged was that of Nyhuis. Moreover, Nyhuis was not involved in any of the offshore importation activities that predominate the Florida indictment. To the extent this factor weighs in favor of Nyhuis, the weight is not substantial.

### 3. Conclusion

After weighing the *Marable* factors, we conclude that Nyhuis has failed to carry his burden of making out a prima facie double jeopardy claim. The record reflects that there were two conspiracies operating in diverse locations: an earlier marijuana distribution ring, based in Michigan, headed by Nyhuis, and supplied by various individuals including George Marian; and a second operation dealing primarily in the importation of cocaine, headed by Marian and based in Florida. The almost complete diversity between the conspirators involved and the difference in overt acts alleged weighs heavily

against Nyhuis. The fact that Nyhuis was involved in both conspiracies does not mean the two conspiracies were merged for double jeopardy purposes. That the two conspiracies were fundamentally different was acknowledged by Nyhuis himself. In explaining why he had initially concealed his cocaine involvement from the Government after pleading guilty in Michigan, Nyhuis told DEA Agent Scott Herman that he regarded the cocaine smuggling as "a separate deal" from the marijuana trafficking. Indeed it was. We hold, therefore, that the Double Jeopardy Clause was not a bar to this prosecution of Nyhuis in Florida.

### D. NYHUIS'S MULTIPLE PUNISHMENT CLAIM

■ Nyhuis also contends that he was deprived of his double jeopardy protection against multiple punishments because, after his Michigan marijuana case sentence was increased based on his Florida cocaine activities, he was convicted of and punished again for those same cocaine activities in the present case. The district court found this "a far more difficult issue," explaining that "[i]t appears from the record presently before this Court that Defendant Nyhuis'[s] Michigan Plea Agreement was renegotiated to include an additional five years of imprisonment for his cocaine trafficking." The district court, however, declined to rule on this claim when it was raised before trial. Relying on the Tenth Circuit's opinion in *United States v. Koonce*, 885 F.2d 720 (10th Cir.1989), *cert. denied*, —— U.S. ——, 112 S.Ct. 1695, 118 L.Ed.2d 406, *and cert. denied*, —— U.S. ——, 112 S.Ct. 1705, 118 L.Ed.2d 413 (1992), the court held that the issue of multiple punishments was not ripe for review. We need not consider whether the district court's ripeness conclusion was correct at the time of the pretrial ruling. Because Nyhuis has since been tried, convicted, and sentenced on the Florida charges, his multiple punishment claim is now ripe for review.

The issue presented is whether a defendant may be prosecuted and punished for conduct that has already been used to enhance the defendant's sentence for a convic-

tion in an earlier prosecution. While this Court has not addressed this specific question, those courts of appeals that have are in agreement that the Double Jeopardy Clause presents no bar to this practice. In *United States v. Mack*, 938 F.2d 678 (6th Cir.1991), the defendant had his sentence on a drug conspiracy conviction enhanced because he had initially failed to appear for sentencing. Thereafter, he was indicted for a knowing failure to appear for sentencing in violation of 18 U.S.C. § 3146. He moved to dismiss that indictment on double jeopardy grounds. The district court denied the motion, and the Sixth Circuit affirmed that denial. The Sixth Circuit explained its reasoning:

> The consideration of collateral conduct for purposes of sentence enhancement is not new. Section 1B1.3 of the Sentencing Guidelines simply memorializes a long standing practice of trial judges. Prior convictions of a defendant routinely are used to determine the quantity of sentence. If Appellant is correct, then any consideration is a second punishment and therefore violative of the Double Jeopardy Clause.
>
> An enhanced sentence because of a prior conviction is no more double jeopardy than is a consideration of other relevant conduct, including the likelihood of a subsequent conviction.

*Mack*, 938 F.2d at 681.

The Seventh Circuit reached the same conclusion as the Sixth Circuit under nearly identical facts in *United States v. Troxell*, 887 F.2d 830 (7th Cir.1989). In that case the sentencing judge made it clear that he considered the defendant's failure to appear on the initial sentencing date as an aggravating circumstance in sentencing her on a conviction for the distribution of cocaine. The defendant was subsequently indicted for that failure to appear at her sentencing hearing, in violation of 18 U.S.C. § 3146. The district court denied her motion to dismiss the indictment on double jeopardy grounds, and the Seventh Circuit affirmed. Stressing that it "is important that a court have full and complete knowledge of the defendant before the imposition of a sentence ... includ[ing] 'alleged criminal activity for which the defen-

dant has not been prosecuted,'" *id.* at 835 (citation omitted), the Seventh Circuit found that "[m]ere mention of a bad act in sentencing for a crime does not amount to attachment of jeopardy for that act." *Id.* at 836. The court held that the defendant "properly was punished for distributing cocaine in violation of 21 U.S.C. § 841(a)(1), and also was punished only once for her failure to appear for sentencing in violation of 18 U.S.C. § 3146." *Id.*

In *United States v. Garcia*, 919 F.2d 881 (3d Cir.1990), the defendant had been arrested three times for drug-related offenses and used different names and addresses in each instance. The Government initially learned of only the second and third arrests, so it only indicted the defendant for those activities. After the defendant pleaded guilty, but before sentencing, the Government learned of the other arrest and apprised the sentencing court of it. The extent to which the court relied on this information was unclear, but the defendant was sentenced at the upper end of the Guidelines range. The defendant was then indicted for the drug activities that had led to that other arrest. The defendant's motion for dismissal of those charges on double jeopardy grounds was granted, but the Third Circuit reversed, explaining:

> If we were to hold that the defendant in such a case has presented a *prima facie* case of a double jeopardy violation, such a *prima facie* case would exist in all situations where the presentence report in the first prosecution makes any reference to the unadjudicated criminal conduct. We believe considerable mischief would result if in every such case, the government had the burden of ruling out any possibility of a use that implicates double jeopardy values.

*Id.* at 887.

In *Sekou v. Blackburn*, 796 F.2d 108 (5th Cir.1986), the defendant argued that he was punished twice for the same offense when he was sentenced for felony-murder after the murder had been considered as an aggravating circumstance in his earlier sentencing for armed robbery. The Fifth Circuit rejected the argument:

We hold that consideration of other crimes at sentencing does not implicate the Double Jeopardy Clause because the defendant is not actually being punished for the crimes so considered. Rather, the other crimes aggravate his guilt of, and justify heavier punishment for, the specific crime for which defendant has just been convicted.

*Id.* at 112. Thus, four other circuits that have addressed this issue have agreed that consideration of uncharged criminal activity in a prior sentence proceeding does not bar subsequent prosecution and punishment of that activity.

The district court expressed concern that Nyhuis's Michigan plea agreement was revised after his cocaine involvement came to light. The Government contends that this revision was based on the fact that Nyhuis had lied to the Government and to a grand jury about his involvement with Marian and in the cocaine business. There is a conflict in the evidence about exactly why Nyhuis's plea agreement was renegotiated to his detriment, but that factual issue is irrelevant to our decision. The Government does not dispute that the Michigan district court considered Nyhuis's cocaine activities in sentencing him on the CCE conviction, and it is the district court that set his punishment. Even if Nyhuis's Michigan sentence was enhanced because of his Florida cocaine activities, the punishment he received for those same activities in this case did not violate double jeopardy principles.

We join the Third, Fifth, Sixth, and Seventh Circuits in holding that the Double Jeopardy Clause does not bar prosecution and punishment for criminal conduct that has already been considered and used as the basis for a sentence enhancement in an earlier prosecution. The district court's denial of Nyhuis's motion to dismiss on double jeopardy grounds was proper.

## II. NYHUIS'S IMMUNITY CLAIM

■ Nyhuis claims that "the majority of the information used to indict [him in this Florida case] was obtained directly or indirectly as a result of [his] own original immunized testimony in Michigan." Nyhuis further states, "[o]bviously, all parties to the plea agreement were working under the impression that [Nyhuis] would receive immunity in Florida for his testimony and cooperation with the Government in their investigation of George Marian and his cocaine transactions." Nyhuis argued before the district court and again on appeal that this Florida prosecution violates the protections afforded to him under the Supreme Court's decision in *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). In response to Nyhuis's *Kastigar* challenge, and after several evidentiary hearings in connection with his motions to dismiss, the district court held:

> Because the indictment in the federal court in Florida was the result of an investigation conducted by Agent Waller through sources independent of Defendant Nyhuis's proffer, Grand Jury testimony, and the information given the authorities in the Western District of Michigan, use immunity will not bar the prosecution of Nyhuis in the Florida Court, *U.S. v. Harvey,* 869 F.2d 1439 (11th Cir.1989). While Defendant was granted transactional immunity in the Western District of Michigan, such transactional immunity will not bar his prosecution pursuant to the Florida indictment. *United States v. Brady,* [87–5578] (11th Cir. April 7, 1988).

> The Defendant having raised no issue that the Plea Agreement is ambiguous, the Motion to Dismiss the indictment of Defendant Nyhuis on grounds of immunity is denied.

In *Kastigar,* the Supreme Court reaffirmed the principles underlying the proscription against the use of immunized testimony:

> While a grant of immunity must afford protection commensurate with that afforded by the [Fifth Amendment] privilege [against self-incrimination], it need not be broader.... The privilege has never been construed to mean that one who invokes it cannot subsequently be prosecuted. Its sole concern is to afford protection against being "forced to give testimony leading to the infliction of 'penalties affixed to ...

criminal acts.'" Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection. It prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness.

*Kastigar*, 406 U.S. at 453, 92 S.Ct. at 1661 (footnote with citations omitted). This Court thoroughly reviewed the topic of immunity grants in *United States v. Harvey*, 869 F.2d 1439 (11th Cir.1989). As was stated in *Harvey*, "[d]ue process requires the government to adhere to the terms of any plea bargain or immunity agreement it makes." *Id.* at 1443. "[W]e apply the same rules and method of analysis to an informal grant of use or transactional immunity as we would to a formal grant." *Id.* at 1444 (footnote omitted). The distinctions between use and transactional immunity were carefully drawn in *Harvey*:

> Use immunity prohibits the use of compelled testimony, or any evidence derived directly or indirectly from that testimony, against the witness in a criminal prosecution. *See generally Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). In contrast to transactional immunity, use immunity does not prohibit the government from prosecuting the witness for crimes about which he testified, provided the government proves that it has other evidence to support the prosecution that "is derived from a legitimate source wholly independent of the compelled testimony." *Id.*, 406 U.S. at 460, 92 S.Ct. at 1665....

> ....

> Transactional immunity "accords full immunity from prosecution for the offense to which the compelled testimony relates." *Kastigar v. United States*, 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1972). The purpose of a grant of transactional (or use) immunity is to preclude a witness's reliance on his fifth amendment privilege against compelled self-incrimination: the government may compel a witness to testify by granting him immunity, provided that the scope of the immunity is

at least as great as that of the fifth amendment privilege that the witness must forego. *Kastigar v. United States*, 406 U.S. at 449, 92 S.Ct. at 1659.... As such, in deciding the scope of a grant of immunity the Supreme Court traditionally has referred to the scope of the fifth amendment privilege itself.

*Id.* at 1444–45 (footnote and citation omitted). Our review of a *Kastigar* claim is a deferential one and "we must affirm the district court's *Kastigar* decision unless it is clearly erroneous." *United States v. Dynalectric Co.*, 859 F.2d 1559, 1578 (11th Cir.1988), *cert. denied*, 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 157 (1989).

The district court conducted extensive *Kastigar* proceedings in this case. The Government's witnesses included assistant U.S. attorneys and DEA agents involved in the Michigan and Florida investigations and prosecutions. Assistant U.S. Attorney Courtade, who prosecuted Nyhuis in Michigan, testified that "it was our understanding and intent not to grant immunity in other districts [than the Western District of Michigan], for the reason that we believe that Mr. Nyhuis would be more cooperative if under the threat of other prosecutions." DEA Agent Douglas Waller, the Florida case agent who presented the indictment to the Florida grand jury, testified that before the date of the first Florida indictment in which Nyhuis was named, he had never seen any Michigan DEA reports from Nyhuis's debriefing, nor any of Nyhuis's grand jury testimony, nor any other information furnished by Nyhuis. Agent Waller also testified as to the "independent" source of information who implicated Nyhuis in the Florida conspiracy. Finally, Agent Waller stated that he was aware of the "potential problems" under *Kastigar* in using testimony of cooperating witnesses and had been advised to "use extreme caution" in this area. The district court found this testimony persuasive and so do we.

The district court also found that Nyhuis "raised no issue that the Plea Agreement is ambiguous." Nyhuis has apparently changed his mind and now argues that the agreement is ambiguous. We cannot agree. This Court has recently articulated principles

that should be employed in interpreting plea agreements:

> Plea agreements are interpreted and applied in a manner that is sometimes likened to contractual interpretation. This analogy, however, should not be taken too far.... First, ... a "hyper-technical reading of the written agreement" and "a rigidly literal approach in the construction of language" should not be accepted. Second, the written agreement should be viewed "against the background of the "negotiations" and should not be interpreted to "directly contradic[t an] oral understanding." Finally, a plea agreement that is ambiguous "must be read against the government." The rationale for this method of interpretation is that a plea agreement must be construed in light of the fact that it constitutes a waiver of "substantial constitutional rights" requiring that the defendant be adequately warned of the consequences of the plea.

*United States v. Jefferies,* 908 F.2d 1520, 1523 (11th Cir.1990) (citations omitted). We find no ambiguity in the relevant provision of the plea agreement. The Government "agree[d] not to bring additional criminal charges against the defendant in the Western District of Michigan arising out of his involvement in the distribution of marijuana." It has not done so. The Government further agreed not to bring additional charges against Nyhuis arising out of "those transactions disclosed by the defendant in the proffer *already* made to the government." (Emphasis added.) It has not done so. At the time the plea agreement was executed, Nyhuis's proffer to the Government did not include any mention of his involvement with George Marian or in the cocaine trade. Indeed, the day after he executed the agreement, Nyhuis denied such involvement in his testimony before the Michigan grand jury. The Government has offered the credible and uncontradicted testimony of Agent Waller that it subsequently developed independent information concerning Nyhuis's involvement in Marian's cocaine conspiracy. To permit Nyhuis retroactively to sweep his cocaine involvement within the ambit of the plea agreement would be an endorsement of the strategy of telling a little and hiding a lot. A defendant may not stretch an agreement beyond its terms in order to escape prosecution on deliberately concealed conduct. Disingenuous behavior, like narcotics trafficking, comes with a price.

Nyhuis also points to his own subjective belief that he was given global immunity, and his conclusory statement that the "standardized language" in the plea agreement did not accurately reflect the agreement of the parties. Neither of these contentions is persuasive. Based on this record, we conclude that the district court's denial of Nyhuis's *Kastigar*-based motion to dismiss was not clearly erroneous.

## III. GOODMAN'S "ORGANIZER OR LEADER" SENTENCING CLAIM

At Goodman's sentencing, the district court overruled her objection to the Presentence Report's recommendation of a four-level increase in the base offense level because of Goodman's role as an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). The "organizer or leader" finding resulted in a four-level enhancement to Goodman's base offense level. Based on an adjusted level of 40 and a criminal history category of I, the court sentenced her to a 312–month term of imprisonment.

### A. THE FACTS

In May and June of 1988, Goodman and her husband, Ricky Goodman, who were indicted along with Marian, Nyhuis, and others, collaborated with Marian on a scheme to import a 1,500 kilogram load of cocaine into the United States. According to witnesses at her trial, Goodman and her husband were "partners" in the narcotics trafficking trade. However, the aiding and abetting charge against Mrs. Goodman relates solely to the 1,500 kilogram load.

The idea for this load originated as a result of some trouble that Ricky Goodman was having with his Colombian sources of supply. George Marian testified at Mrs. Goodman's trial that he had heard "through the grape-

vine" that Ricky Goodman had been smuggling marijuana for a group of Colombians and that part of a shipment had been lost. As a result, the Colombians kidnapped Ricky Goodman. Although he was later released, Ricky Goodman needed to do a drug shipment to "work off" his debt to the Colombians. George Marian agreed to help Ricky Goodman with a load of drugs to pay Goodman's debt; however, Marian also informed the DEA of the plan. According to Marian, he and Ricky Goodman discussed the plan with a representative of the Colombian cocaine source at Marian's house. Marian's girlfriend, Donna Lemons, and Mrs. Goodman were also present in the house but did not participate in the discussions.

On the night of the transaction, Marian, Ricky Goodman and three boat drivers met a freighter that was carrying the cocaine. After the 1,500 kilograms were offloaded, approximately ninety-eight kilograms disappeared. Marian testified that shortly after the shipment, while Marian was staying at the Goodmans' home in Miami, Mrs. Goodman mentioned to him that some "pieces [of the shipment] were missing" and that she was concerned about her husband's welfare because of the missing cocaine. But Marian also stated that he did not believe that Mrs. Goodman "had any knowledge of what was going on."

At Goodman's trial, Marian's girlfriend, Lemons, testified that Goodman told her that she knew the Colombians very well and that they had bought her jewelry. Lemons also claimed to have overheard Marian, Ricky Goodman, and Mrs. Goodman discuss smuggling ventures. According to Lemons, Mrs. Goodman had stressed to her how important the 1,500 kilogram load of cocaine was because of Ricky Goodman's debt to the Colombians, and Mrs. Goodman also had said that the Goodmans needed to make money because she was pregnant. An associate of Ricky Goodman, Stephen Pisacano, testified that Mrs. Goodman "spearheaded" the effort to get Ricky Goodman released from the Colombians, and that she participated with her husband in soliciting from Pisacano a $50,000 investment in the 1,500 kilogram cocaine venture.

Goodman now offers two arguments in support of her claim that the district court erred in adopting this recommendation. First, Goodman contends that because she was charged only as an aider or abettor of the offense, she cannot be punished for having played a leading role in it. Second, Goodman argues that § 3B1.1 requires the court to focus on "the defendant's role in the offense," and not on any other alleged criminal conduct. According to Goodman, the court erred in improperly considering evidence of Goodman's involvement in criminal activity other than the offense of conviction.

## B. THE *JONES* RULE REQUIRING PRESENTATION OF ISSUES TO SENTENCING COURTS

The well-established rule in this Circuit is that "[w]here the district court has offered the opportunity to object and a party is silent or fails to state the grounds for objection, objections to the sentence will be waived for purposes of appeal." *United States v. Jones,* 899 F.2d 1097, 1103 (11th Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 275, 112 L.Ed.2d 230 (1990), *overruled on other grounds by United States v. Morrill,* 984 F.2d 1136 (11th Cir. 1993) (en banc).

In the context of evidentiary objections, we have rejected attempts to introduce new arguments on appeal:

> To preserve an issue at trial for later consideration by an appellate court, one must raise an objection that is sufficient to apprise the trial court and the opposing party of the particular grounds upon which appellate relief will later be sought. A general objection *or an objection on other grounds will not suffice.*

*United States v. Dennis,* 786 F.2d 1029, 1042 (11th Cir.1986) (holding that objections to testimony on hearsay and relevance grounds were insufficient to preserve a claim that the district court erred in allowing a grand juror to testify before the jury regarding the materiality of an allegedly false declaration) (emphasis added), *cert. denied,* 481 U.S. 1037, 107 S.Ct. 1973, 95 L.Ed.2d 814 (1987); *see also United States v. Williford,* 764 F.2d 1493, 1502 (11th Cir.1985) (where counsel

argued that admission of sentencing transcript from another case constituted bolstering of a witness's credibility, but made only "vague reference[s] to a concern about the inability to cross-examine the agents," such "statements were not sufficiently specific to apprise the trial judge of a hearsay objection"). The interests to be protected by the contemporaneous objection rule are no less important in the context of the sentencing process. Under the *Jones* rule, defendants have ample opportunity to articulate to sentencing courts their objections to presentence reports and to the court's sentencing decisions.

## C. GOODMAN'S ARGUMENT THAT AN AIDER AND ABETTOR CANNOT BE SENTENCED AS AN ORGANIZER OR LEADER

█ The question of whether Goodman waived her argument that an aider and abettor cannot receive an enhancement as an "organizer or leader" is a close one. However, we need not decide the waiver question because we find Goodman's contention to be without merit. *See, e.g., Smith v. Dugger,* 840 F.2d 787, 791 (11th Cir.1988) (declining to decide a procedural default issue because after considering "the merits it [was] apparent there [was] no substance to the constitutional claim"), *cert. denied,* 494 U.S. 1047, 110 S.Ct. 1511, 108 L.Ed.2d 647 (1990).

Goodman concedes that a person convicted of aiding or abetting "is punishable as a principal." 18 U.S.C. § 2(a); *see also* U.S.S.G. § 2X2.1. The commentary to § 2X2.1 explains that "[t]his section provides that aiding and abetting the commission of an offense has the same offense level as the underlying offense." U.S.S.G. § 2X2.1, comment. (backg'd.). Goodman cites no authority, and we have found none, which holds that "aiding and abetting" and "organiz[ing] or lead[ing]" are mutually exclusive when it comes to sentencing.

The rule advocated by Goodman would mean that a defendant who is indicted as an aider and abettor and whose full level of involvement in a crime only comes to light during trial cannot receive the measure of punishment commensurate with her level of participation. That would not be good. Moreover, such a rule would be inconsistent with our decisions permitting unindicted conduct to serve as a basis for sentence enhancements. *See, e.g., United States v. Ignancio Munio,* 909 F.2d 436, 438–39 (11th Cir.1990) (holding that, although the indictment did not charge an amount of counterfeit currency greater than $10,840, court could consider the evidence of defendant's connection with $1.1 million in counterfeit currency), *cert. denied,* 499 U.S. 938, 111 S.Ct. 1393, 113 L.Ed.2d 449 (1991). The rule Goodman advocates would also be inconsistent with our rule that "'an acquittal does not bar a sentencing court from considering the acquitted conduct in imposing sentence,' if the conduct is established by reliable evidence." *United States v. Lynch,* 934 F.2d 1226, 1234 n.8 (11th Cir.1991) (quoting *United States v. Rivera–Lopez,* 928 F.2d 372, 373 (11th Cir.1991) (per curiam)), *cert. denied,* ––– U.S. –––, 112 S.Ct. 885, 116 L.Ed.2d 788 (1992). Because evidence of unindicted conduct and of conduct for which the defendant has been acquitted can be considered in sentencing, it follows that evidence that goes beyond an averment of the indictment can be considered as well. If the Government establishes by a preponderance of the evidence that a defendant convicted as an aider and abettor was, in fact, an organizer or leader of the offense conduct, that is sufficient under § 3B1.1.

## D. GOODMAN'S ARGUMENT THAT THE DISTRICT COURT RELIED IMPROPERLY ON EVIDENCE OF GOODMAN'S OTHER CRIMINAL CONDUCT IN SENTENCING HER AS AN ORGANIZER OR LEADER UNDER U.S.S.G. § 3B1.1

While Goodman's first contention presented a close waiver question, her second one does not. Goodman did object to the Presentence Report's recommendation of a four-level increase on the grounds that such an increase was not supported by the evidence adduced at trial. Goodman failed to suggest to the district court, however, that it had improperly considered evidence of Goodman's other criminal activity. Therefore, our review of Goodman's contention is limited to

determining whether the district court committed plain error. *See United States v. Neely,* 979 F.2d 1522, 1523 (11th Cir.1992) ("We will only consider objections raised for the first time on appeal under the plain error doctrine to avoid 'manifest injustice.'"). We cannot say that it did. *See generally United States v. Olano,* — U.S. —, —, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993) (examining the limitations on appellate authority under Fed.R.Crim.P. 52(b)).

The convictions and sentences of Nyhuis and Goodman are AFFIRMED.