# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-3730

_____

United States of America,       *

            *

           Appellee,      *

            *      Appeal from the United States

       v.             *      District Court for the

            *      Western District of Missouri.

Christopher McFarlane,       *

            *

           Appellant.     *

_____

Submitted: May 14, 2002
Filed: October 30, 2002

_____

Before HANSEN, Chief Judge, MORRIS SHEPPARD ARNOLD, Circuit Judge, and PRATT,[1] District Judge.

_____

HANSEN, Circuit Judge.

Christopher McFarlane appeals from the district court's[2] judgment sentencing him to a total of 110 months of imprisonment and five years of supervised release

_____

[1]The Honorable Robert W. Pratt, United States District Judge for the Southern District of Iowa, sitting by designation.

[2]The Honorable Nanette K. Laughery, United States District Judge for the Western District of Missouri.

after McFarlane pleaded guilty to violations of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 924(c). Mr. McFarlane argues that he should have received a greater downward departure on his drug sentence. Because we determine that McFarlane's sentence was not imposed in violation of law, we dismiss the appeal for want of jurisdiction.

I.

McFarlane was arrested with three codefendants when they attempted to purchase two kilograms of cocaine from an undercover agent during a "reverse sting" operation. McFarlane, through counsel, approached the government shortly after his arrest and expressed his desire to cooperate. The government provided McFarlane with a Kastigar[3] letter outlining the terms under which it would accept his cooperation, which provided that "'as to [any] debriefings, it is agreed that, pursuant to U.S.S.G. § 1B1.8, any information to be used in the sentencing of Mr. McFarlane will not include information provided to the government by Mr. McFarlane during the course of these debriefings. . . . McFarlane also understands and agrees that he will truthfully testify at any and all court proceedings, . . . if required . . . .'" (Appellee's Br. at 4 (quoting Cooperation Agreement).) McFarlane signed the letter on March 15, 2000, and began assisting the government in other investigations and testified as a government witness against his codefendants. McFarlane pleaded guilty on October 26, 2000, pursuant to a separate plea agreement with the government, under which he agreed to plead guilty to the two charged offenses, and the government agreed to make a motion for a downward departure for substantial assistance.

At McFarlane's sentencing, the government made its promised downward departure motion pursuant to U. S. Sentencing Guidelines Manual §5K1.1 (2000) and 18 U.S.C. § 3553(e) and argued that "this defendant [has] earned . . . the lowest

_____

[3]Kastigar v. United States, 406 U.S. 441 (1972).

2

possible sentence that the court could feel comfortable with." (Sent. Tr. at 11.) The government asserted that McFarlane's testimony resulted in the conviction of one of his codefendants and aided substantially in the investigation of the international drug dealings of the Jamaican Waterhouse Posse, of which McFarlane was a long-time member. McFarlane faced a sentencing range of 60 to 71 months for the drug count and a mandatory consecutive 60-month term for the weapon charge. The district court granted the government's motion to depart downward and sentenced McFarlane to 50 months on the drug count and 60 months on the weapon count, to be served consecutively. The sentencing judge had presided over McFarlane's codefendants' trial, during which McFarlane testified about his own extensive 15-year drug dealing history. After sentencing McFarlane, the district judge commented that had she not known the extent of McFarlane's drug dealing history, she likely would have given him a "different sentence," which we interpret to mean an even greater departure. (Sent. Tr. at 16.) In what we are sure was a rare move by the government, it filed a "Motion for Reconsideration of Sentencing," asking the court to resentence McFarlane without considering the testimony he gave about his own drug dealing history during his codefendants' trial. The district court denied the motion and McFarlane appeals.

II.

This case reaches us in an odd posture: the defendant appeals the denial of the government's Motion for Reconsideration of Sentencing, and both the defendant and the government argue that we should remand the case for resentencing, asserting that the district court should have granted a greater downward departure in light of McFarlane's substantial assistance. Although we generally lack jurisdiction to review the extent of a district court's downward departure, see United States v. McCarthy, 97 F.3d 1562, 1577 (8th Cir. 1996), cert. denied, 519 U.S. 1139 (1997) and 520 U.S. 1133 (1997), McFarlane argues that the district court's failure to grant him a greater downward departure because of his immunized testimony violates his Fifth

3

Amendment right against self-incrimination.  A defendant may appeal his sentence in limited circumstances, including when the sentence "was imposed in violation of law."  18 U.S.C. § 3742(a)(1).  See also United States v. DeBuse, 289 F.3d 1072, 1075 (8th Cir. 2002) (noting that the defendant did not assert a violation of federal statutory or constitutional law in holding that the court lacked jurisdiction to review the extent of the district court's downward departure). Although the statute authorizes McFarlane to appeal, and we have jurisdiction, only if his sentence was in fact imposed in violation of law, we cannot make that determination without reaching the merits of his argument.  We therefore must necessarily exercise "jurisdiction to determine [our] own jurisdiction."  United States v. Ruiz, 122 S. Ct. 2450, 2454 (2002) (holding that the Ninth Circuit  properly exercised jurisdiction to address defendant's constitutional challenge to the district court's declination to depart downward, although the challenge was ultimately denied).

Pursuant to his Cooperation Agreement with the government, McFarlane testified as a government witness against his codefendants in their November 27, 2000, trial.  During his direct examination by the government, McFarlane testified about his extensive drug dealings and his affiliation with the Jamaican Waterhouse Posse.  During cross-examination, McFarlane admitted to selling 400 to 500 kilograms of cocaine. McFarlane and the government believe that McFarlane's Fifth Amendment privilege against compelled self-incrimination was violated when the district court considered this testimony in sentencing McFarlane on September 6, 2001.  The district court was aware of the testimony only because the same judge presided over the trial and later sentenced McFarlane.

The Fifth Amendment grants to all persons the privilege against compelled self-incrimination by providing that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  The Supreme Court has limited the Fifth Amendment privilege to prohibiting the use of physical or moral compulsion; the fact that a criminal defendant faces difficult choices does

4

not necessarily compel the individual's choice so as to implicate the Fifth Amendment. See South Dakota v. Neville, 459 U.S. 553, 562-63 (1983) (holding that South Dakota's law requiring a person arrested for drunk driving to submit to a blood alcohol test or face having his refusal used against him did not violate the Fifth Amendment). "The 'Amendment speaks of compulsion,' United States v. Monia, 317 U.S. 424, 427 . . . (1943), and the [Supreme] Court has insisted that the 'constitutional guarantee is only that the witness not be *compelled* to give self-incriminating testimony.' United States v. Washington, 431 U.S. 181, 188 . . . (1977)." McKune v. Lile, 122 S. Ct. 2017, 2026 (2002) (plurality opinion) (holding that prison did not violate prisoner's Fifth Amendment rights when it changed the prisoner's privilege status level and moved him to a maximum-security facility when he refused to participate in a sexual abuse treatment program, during which he would have been required to admit all prior improper sexual activities without any guaranty of immunity).

The Fifth Amendment privilege against self-incrimination is not absolute. By statute, a witness may not refuse to testify on the basis of the Fifth Amendment if he or she has been granted immunity by order of the presiding court. See 18 U.S.C. § 6002. When a witness refuses to testify in violation of § 6002, the witness is subject to the court's contempt powers. The Supreme Court upheld § 6002's statutory grant of immunity against a constitutional challenge by determining that the statutory immunity was co-extensive with the Fifth Amendment privilege. See Kastigar, 406 U.S. at 458-59. Thus, so long as the immunity granted is coextensive with the Fifth Amendment privilege, a witness can be compelled to testify against himself.

Prosecutors often enter into informal immunity agreements with criminal defendants, promising immunity in exchange for information from the defendant about other criminal activity, which information may also incriminate the defendant in the wrongdoing. Absent coercion by the government, which is not here alleged, the defendant is not compelled to enter the agreement, but is a party to a bargained-

for exchange. The government gains information with which to prosecute other criminals, and the defendant receives the government's promise not to use the information against the defendant, depending on the specifics of the particular agreement. In entering the agreement, however, the defendant essentially gives up his right to later assert his Fifth Amendment privilege not to incriminate himself within the context of the testimony he agrees to provide, or face the consequences of breaching the immunity agreement.

While "[t]he protection given a defendant by an immunity agreement is coextensive with the protection against self-incrimination afforded by the Fifth Amendment," United States v. Abanatha, 999 F.2d 1246, 1249 (8th Cir. 1993) (citing Kastigar, 406 U.S. at 453), cert. denied, 511 U.S. 1035 (1994),[4] the immunity agreement itself governs the scope of the immunity involved. When a defendant enters an informal immunity agreement with the government rather than asserting his Fifth Amendment privilege against being compelled to incriminate himself, "the scope of informal immunity is governed by the terms of the immunity agreement." United States v. Luloff, 15 F.3d 763, 766 (8th Cir. 1994). This is true because an immunity agreement is likened to a contract between the government and the defendant, a concept universally recognized by courts faced with enforcing such agreements. See id.; United States v. Crawford, 20 F.3d 933, 935 (8th Cir. 1994) (holding that immunity agreements are analogous to plea agreements and are enforced under principles of contract law, within the constitutional safeguards of due process);

---

[4]Contrary to McFarlane's and the government's positions, Abanatha does not stand for the broad proposition that any time a defendant enters any type of immunity agreement, information provided pursuant to the agreement cannot be used in any circumstance. The scope of the immunity agreement at issue in Abanatha was not discussed by that court. We are left to surmise that the government's actions violated the terms as delineated in that agreement. Further, the court in Abanatha explicitly noted that the case did not involve using immunized information to inform a downward departure based on substantial assistance, as is specifically allowed by USSG § 1B1.8. Abanatha, 999 F.2d at 1250.

6

United States v. Conway, 81 F.3d 15, 17 (1st Cir. 1996); United States v. Cantu, 185 F.3d 298, 302 (5th Cir. 1999); United States v. Brown, 979 F.2d 1380, 1381 (9th Cir. 1992); United States v. Nyhuis, 8 F.3d 731, 742 (11th Cir. 1993), cert. denied, 513 U.S. 808 (1994). McFarlane recognizes this concept as well. (See Appellant's Br. at 20.) Thus, the immunity agreement defines the extent of the immunity granted to the defendant and Fifth Amendment principles define the protection to be afforded the defendant within the scope of the granted immunity.

We turn, then, to the agreement McFarlane entered into with the government to determine the scope of the immunity he received from the government. The letter agreement provided that "'pursuant to U.S.S.G. § 1B1.8, any information to be used in the sentencing of Mr. McFarlane will not include information provided to the government by Mr. McFarlane during the course of these debriefings.'" (Appellee's Br. at 4 (quoting Cooperation Agreement) (emphasis added).)[5] The letter explicitly referred to USSG § 1B1.8, which provides that "[w]here . . . as part of [a] cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement." USSG § 1B1.8(a). The guideline further provides that "subsection (a) shall not be applied to restrict the use of information: . . . (5) in determining whether, or to what extent, a downward departure from the

---

[5]The plea agreement entered into on October 26, 2000, clearly informed McFarlane that any "new" information supplied would be provided to the sentencing court and could be used to determine if, and to what extent, he would be granted a downward departure. McFarlane argues that the government learned about his prior drug dealing during the debriefings, which information they then used to question him during his codefendants' trial. It is this testimony that McFarlane argues that the sentencing judge inappropriately considered. We are concerned, therefore, with the immunity granted in the Kastigar letter rather than the later plea agreement, which clearly supported the district court's sentence.

guidelines is warranted pursuant to a government motion under § 5K1.1 (Substantial Assistance to Authorities)." USSG § 1B1.8(b).

The language of the agreement is quite similar to the cooperation agreement at issue in Conway, which was also entered "pursuant to U.S.S.G. § 1B1.8." 81 F.3d at 16. The defendant appealed his sentence, arguing that the district court violated his Fifth Amendment right by considering immunized testimony in denying the government's motion for a downward departure for providing substantial assistance. The First Circuit agreed that as written, the cooperation agreement did "not provide the blanket protection defendant claims he bargained for in exchange for waiver of his Fifth Amendment right." Id. at 16-17. The First Circuit reversed the sentence, however, because the district court quoted only part of the plea agreement during the plea hearing, leaving the impression that the immunized testimony would not be used against the defendant for any purpose. Thus, the sentence was vacated only because the extent of the immunity granted to the defendant was made unclear by the district court. Had it not been for the court's inadvertent misstatement during the plea hearing, the court would have been free under the agreement to use the information obtained during debriefing to deny the downward departure. Id. at 17-18 (Selya, J., concurring).

The agreement at issue here clearly limited its terms to the scope of § 1B1.8. Thus, looking to the agreement in the light of § 1B1.8 to determine the scope of the immunity granted to McFarlane, information provided by McFarlane during the debriefings could not be used to determine the applicable guideline range, but could be used to determine whether, and to what extent, he should receive a downward departure for providing substantial assistance to the government. The sentencing court did just that. It did not consider McFarlane's extensive drug dealing history in setting his guideline range of 60 to 71 months, but did consider that history in determining whether to grant a downward departure and how much of a departure to grant. The court granted the government's motion for a downward departure, but

limited the extent of the departure based in part on McFarlane's extensive drug dealing history. Thus, the terms of McFarlane's cooperation agreement, and correspondingly his constitutional rights, were not violated when he received at least a ten-month downward departure, based partly on testimony he gave at his codefendants' trial. See Luloff, 15 F.3d at 766 (holding that an immunity agreement limited to Title 21 drug offenses was not violated when the defendant was charged with unlawfully possessing a gun, a nondrug offense, based on testimony provided pursuant to the immunity agreement); Nyhuis, 8 F.3d at 742 (holding that the government did not violate an immunity agreement where the agreement limited its protection to information already disclosed to the government and the information used against the defendant was provided post-agreement).

Finally, McFarlane argues that the district court abused its discretion in not granting him a greater downward departure based on public policy grounds. We decline to address this argument, however, as the extent of the district court's downward departure is unreviewable absent allegations that his sentence "was imposed in violation of law" under§ 3742(a)(1). See McCarthy, 97 F.3d at 1577.

III.

Because McFarlane's sentence was not "'imposed in violation of law[,]' . . . § 3742(a)(1) does not authorize [McFarlane's] appeal." Ruiz, 122 S. Ct. at 2454. We therefore dismiss this appeal for lack of jurisdiction.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

9