**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Carl A. SMITH, Defendant–Appellant.**

No. 91–5410.

United States Court of Appeals,
Fourth Circuit.

Argued May 8, 1992.

Decided Sept. 24, 1992.

As Amended Oct. 27, 1992.

**862**

James McCall Cagle, Charleston, W.Va., argued, for defendant-appellant.

Mary Stanley Feinberg, Asst. U.S. Atty., Charleston, W.Va., argued (Michael W. Carey, U.S. Atty., on brief), for plaintiff-appellee.

Before MURNAGHAN and NIEMEYER, Circuit Judges, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.

## OPINION

MURNAGHAN, Circuit Judge:

Carl A. Smith, the former manager of the West Virginia office of the United States Department of Housing and Urban Development ("HUD"), brought the instant appeal challenging his conviction for receiving a bribe, causing the filing of a false cost certificate for a HUD project, filing false tax returns, and perjury, in violation of 18 U.S.C. § 201(b)(2), 18 U.S.C. §§ 1010 and 2, 26 U.S.C. § 7206(1), and 18 U.S.C. § 1623(a). Primarily, Smith has contended that the district court misinterpreted and misapplied an immunity agreement which he obtained in connection with his testimony against a HUD consultant, Frank Vinson, in an earlier trial. Because we find that the district court misinterpreted the immunity agreement and permitted the Government to base its prosecution of Smith on evidence that was clearly precluded by the immunity agreement, we reverse Smith's conviction.

## I.

As early as the fall of 1987, federal law enforcement agents had received allegations about misconduct by Smith in his role as Manager of the West Virginia HUD office. However, in 1987 investigators focused attention on Frank Vinson, a HUD consultant. In October of 1989, Vinson went to trial on charges of receiving unlawful gratuities, perjury and wiretapping. The Government subpoenaed Smith, who retained counsel (a former United States attorney) and refused to testify without an immunity agreement. Smith's attorney bargained for and received a use immunity agreement, signed on October 20, 1989, which provides in pertinent part that "The United States will not prosecute of [sic] Mr. Smith for any federal offense based on information now in the possession of the government." After obtaining the immunity agreement, Smith testified at Vinson's trial.

Following the Vinson trial, investigators continued examining Maurice Toler, a HUD contractor. In early 1990, an anonymous telephone call tipped off investigators that Toler had bought Smith a farm combine in connection with some HUD projects. The investigation then focused on Smith. It was at that time that investigators began to review HUD telephone records in their possession and discovered a large number of telephone calls from Smith's extension to Toler. Furthermore, investigators found bank records from a Toler-related company that indicated the purchase of a combine for delivery to Smith. Investigators also uncovered evidence of other bribes apparently given to further Toler's success in obtaining and maintaining HUD contracts. Additionally, investigators audited a previously filed Certificate of Actual Cost for a HUD project, known as the Lemma Village, and found that the certificate had been inflated.

Subsequently, the United States Attorney's Office notified Smith's attorney that Smith was the target of a grand jury investigation and that indictment was imminent. Smith filed an injunctive action to prevent indictment based upon the October 20, 1989 immunity agreement. The district court denied Smith's request for injunctive relief, and Smith appealed. However, prior to the

appeal being heard, Smith was indicted and the appeal was dismissed as moot.

Prior to trial, Smith argued to the district court that the immunity agreement precluded the Government from using any information in its possession as of October 20, 1989, when the immunity agreement was signed. The Government argued that only information which on its face indicated wrongdoing was covered by the use immunity agreement. The district court determined that the provision at issue was ambiguous and also determined that both parties should bear equal responsibility for the ambiguity and that neither side would be charged with a greater burden in construing the agreement. The district court went on to accept the Government's interpretation as most reasonable, construing the agreement as precluding the Government from prosecuting Smith based on any information in the possession of any agency of the Government on October 20, 1989, *insofar as it would have indicated the commission of a crime on the part of the defendant.* Based upon this addition of language to, and interpretation of the immunity agreement, the court permitted the Government to use Smith's perjured testimony which occurred before the grand jury, 1987 and 1988 tax returns, and disclosure statements of Maurice Toler's for HUD projects, all of which were indisputably in the hands of the Government *prior* to the October· 20, 1989 immunity agreement.

Based upon the use of such evidence against him at trial, Smith has argued on appeal that the district court afforded a much too narrow interpretation of the immunity agreement and that the introduction of such evidence violated the plain terms of the agreement. The Government, on the other hand, has acknowledged that it used evidence that it had possession of prior to the signing of the immunity agreement; however, the Government has insisted that the use of the information was permissible because the information did not, at the time the agreement was signed, implicate Smith in criminal activity. Thus, the primary issue facing us on appeal is whether the district court's interpretation

and application of the immunity agreement was erroneous.

## II.

■ In determining whether the district court's interpretation and application of the immunity agreement is correct, we conduct a *de novo* review, as only questions of law are implicated. *See United States v. Blackburn,* 940 F.2d 107, 109 (4th Cir. 1991). In interpreting immunity agreements, as with plea agreements, we must be mindful of the fact that "the defendant's underlying 'contract' right is constitutionally based and therefore reflects concerns that differ fundamentally from and run wider than those of commercial contract law." *United States v. Harvey,* 791 F.2d 294, 300 (4th Cir.1986) (citing *Mabry v. Johnson,* 467 U.S. 504, 509, 104 S.Ct. 2543, 2547, 81 L.Ed.2d 437 (1984)). Furthermore, in federal prosecutions, such as the one involved here, "the courts' concerns run even wider than protection of the defendant's individual constitutional rights—to concerns for the 'honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government.'" *Id.* (citing *United States v. Carter,* 454 F.2d 426, 428 (4th Cir.1972)). With those principles in mind, we turn to the district court's interpretation of the immunity agreement in question.

The provision at issue states: "The United States will not prosecute of [sic] Mr. Smith for any federal offense based on information now in the possession of the government." The district court held a factual hearing, pursuant to *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), during which Smith's counsel testified that he had sought "full protection" for his client, that he so informed at least one of the Government's attorneys, and that he attempted to obtain a "bath" for his client. The Government attorney testified that his understanding was that the Government was precluded only from utilizing information which would have indicated the commission of a crime on the part of the defendant, al-

though the attorney apparently did not communicate such a position to Smith or his counsel.

The district court found that the provision was suggested by the defense attorney and that such language had been utilized by the United States Attorney's Office in earlier nonprosecution agreements. Under such circumstances, the district court concluded that the parties should bear equal responsibility for the ambiguity and that neither side should be charged with a greater burden in construing the agreement. The district court went on to interpret the provision as the Government urged, precluding the Government from prosecuting Smith based on any information in the possession of any agency of the Government on October 20, 1989, *insofar as it would have indicated the commission of a crime on the part of the defendant.*

■ In examining the provision of the immunity agreement in question, we find that the language employed in the agreement is in fact unambiguous, precluding the Government from prosecuting Smith *based on (i.e.,* using) any information in its possession on October 20, 1989. If information did not form a basis for a federal offense, it would be neither relevant nor admissible. However, a factual inquiry must nonetheless be made to determine whether the parties intended a different meaning than is facially suggested. *See* Restatement (Second) of Contracts § 214(c) & cmt. b (1979); *id.* § 212; 3 Corbin on Contracts § 542, at 111.

The district court below conducted such a factual inquiry. In the opinion in the instant case, the district court indicated acceptance of the testimony of each side as truthful regarding their intention in employing the language at issue. However, the district court concluded that the Government's interpretation was most reasonable under the circumstances and accordingly adopted it. We conclude, however, that the district court erred in doing so.

Having determined that the parties had differing intentions in employing the language at issue, the district court was required to return to the unambiguous meaning of the language. *See* Restatement (Second) of Contracts § 212 comt. a & illus. 2b.

Accordingly, because we find the terms of the agreement unambiguous and because the parties did not *both* intend a different meaning, we conclude that the district court erred in reading additional language into the immunity agreement, barring prosecution based only on evidence in the Government's possession at the date of signing, *insofar as it would have indicated the commission of a crime on the part of the defendant.* When a court is faced with unambiguous language like the provision at issue,

> Neither side should be able, any more than would be private contracting parties, unilaterally to renege or seek modification simply because of uninduced mistake or change of mind. Such an approach is conformable not only to the policies reflected in private contract law from which it is directly borrowed, but also to constitutional concerns of fundamental · fairness ... and to the wider concerns expressed in the exercise of supervisory jurisdiction over the administration of federal criminal justice.

*United States v. Harvey,* 791 F.2d 294, 300 (4th Cir.1986).

Because the clear language of the immunity agreement prohibited the government from prosecuting Smith using *any* information in its possession on October 20, 1989, the district court erred in reading additional language into the agreement and in admitting evidence in contravention of the terms of the agreement.[1] If the Government had intended to preclude only prosecutions based on evidence in its possession insofar as it indicated the commission of a crime by Smith, the Government surely

---

**1.** *Cf. United States v. Harris,* 973 F.2d 333 (4th Cir.1992) (holding that the Government must "prove that it did not use immunized testimony" when prosecuting a defendant protected by a use immunity agreement).

could have so provided.[2] However, it did not. Even the Government may agree to words having, in fact, unpalatable meanings. The Government, having entered an agreement having an unfortunate meaning, asked that the district court relieve it of the agreement. The district court, in effect, rewrote the immunity agreement to give the Government the benefit of a bargain that it did not make. Accordingly, we reverse Smith's conviction because it was tainted by the introduction of evidence clearly prohibited by the terms of the immunity agreement.[3] Because we have herein afforded Smith full relief based upon his first point of error, we need not address the other issues he raised on appeal.

JUDGMENT REVERSED.

NIEMEYER, Circuit Judge, dissenting:

Carl Smith, a regional HUD manager in West Virginia, was convicted by a jury of accepting a $60,000 in-kind bribe, failing to report the income on his income tax returns, and lying to a grand jury. Interpreting broadly a nonprosecution clause contained in a use-immunity agreement, which Smith had obtained in connection with his testimony against co-employees, the majority effectively concludes that Smith obtained immunity from virtually all prosecutions for federal criminal conduct and therefore must be released from any punishment for his crimes. Because I believe firmly that the agreement, on its face and as described by the parties to it, was never intended to reach so far, I would affirm the convictions.

I

When Carl A. Smith was subpoenaed to give testimony during the prosecution of HUD consultant Frank Vincent, Smith retained Robert King, a former assistant United States attorney, to represent him. In exchange for Smith's cooperation King demanded, on behalf of Smith, a use-immunity agreement in the standard form. He also requested that additional language, previously used by U.S. attorneys, be added to the standard form agreement: "The United States will not prosecute ... Mr. Smith for any federal offense based on information now in the possession of the government." Although Assistant United States Attorney Mary Feinberg suspected Smith at that time of illegal conduct, she concluded that, because her investigation had developed no evidence of wrongdoing, the United States gave up nothing in agreeing not to use against Smith any testimony he gave under the agreement and not to prosecute Smith based on the government's then existing knowledge. The agreement was thus signed on October 20, 1989.

Following Frank Vincent's trial, the investigation into the activities of the West Virginia HUD office wound down for a time, until a tip, that Maurice Toler had bought Smith a farm combine in conjunction with some HUD activities, reopened it. The renewed investigation uncovered evidence of not only the bribe which was the subject of the tip but also other gifts in kind from Toler to Smith, as well as other improprieties concerning Toler's work on a HUD project known as Lemma Village. As the result of this information, Smith was indicted.

2. The absurdity of the Government's position is illustrated by several of its arguments. First, the Government has argued that since Smith's tax returns did not contain a category denominated as "bribes," the Government did not violate the terms of the immunity agreement because the face of the tax returns provided no incriminating evidence against Smith. Likewise, the Government has maintained that the use of HUD documents, disclosure statements and the Certificate of Actual Cost for the Lemma Project, all of which were in its hands prior to the signing of the agreement, was not prohib-

ited because it had not yet audited the forms and had not yet located the falsifications. Yet prosecution was based on those pieces of information already in the possession of the Government. Such a result is clearly not contemplated by the language of the immunity agreement which Smith signed and relied upon.

3. The Government, of course, remains free to retry Smith provided it does not use any information in the possession of any agency of the Government prior to October 20, 1989, the date the use immunity agreement was executed, in such a prosecution.

Before trial, Smith invoked the use-immunity agreement to preclude the United States from using any information in the possession of the government as of October 20, 1989, when the agreement was signed. The question considered by the district court was whether in the agreement the phrase "information now in the possession of the government" referred to *any* information or just *incriminating* information.

After hearing testimony from the parties about their intent when signing the agreement, the district court concluded that because the operative language had previously been used by the U.S. attorney's office but had been requested by Smith's attorney, it was to be construed without favor to either party. The court thereupon held:

> [T]he United States and Mr. Smith have agreed that the United States will not prosecute Mr. Smith for any federal offense based on information of the commission of any such offense in the possession of the government at the date of the agreement on October 20, 1989.
>
>      *     *     *     *     *     *
>
> [T]he United States is precluded from using any information which was in the possession of any agency of the government on October 20, 1989 *insofar as it would then have indicated the commission of a crime on the part of the defendant.*

(Emphasis added.)

During trial, the district court conducted a hearing each day to determine whether the government's proffered evidence for that day should be excluded by reason of the use-immunity agreement as interpreted by the court. Following this procedure, the district court excluded notes of interviews conducted before October 1989, during the earlier HUD investigation, and certain HUD documents (a Smith memorandum requesting waiver of bidding requirements for Lemma Village, a letter from Toler to Smith seeking quicker HUD payments, and documents and testimony by Smith's deputy about them). The court also excluded testimony about Smith's 1987 and 1988 tax returns by IRS agents who

audited them prior to October 1989, although it allowed certain testimony by them on the ground that "none of it would be, in any manner, helpful to the government prosecution of Mr. Smith." The court did, however, admit documents that were in possession of the government which did not indicate the commission of a crime as of October 1989, such as the HUD contract, other standard HUD documents concerning Lemma Village, Smith's tax returns, and a transcript of Smith's grand jury testimony.

The jury found Smith guilty on all counts, and the court sentenced him to 54 months imprisonment. This appeal followed.

Smith now contends that it was error for the district judge to have interpreted the specially added language in a manner that excluded only *incriminating* evidence. He contends that the plain language, "information now in possession of the government," means *all* information in possession of the government on which it would rely to prove a case against Smith. At argument, however, counsel for Smith conceded that some information about Smith, including his name and identification, could not have been intended. For example, had Smith robbed a bank after October 1989, Smith's counsel conceded, the government could use knowledge held prior to October 1989 that the bank was federally insured to prosecute Smith for violating the federal prohibition against robbing a federally insured bank.

## II

The language of the nonprosecution clause at issue reads:

> The United States will not prosecute of [sic] Mr. Smith for any federal offense based on information now [October 20, 1989] in the possession of the government.

This language is a straightforward agreement not to prosecute specifically identifiable *offenses*. The offenses are qualified in two respects: (1) they must be *federal* offenses, and (2) they must be ones that could be prosecuted on October 20, 1989,

based on information then in possession of the government. *Any other offense* is not included within the scope of the agreement. The object of any analysis, therefore, must begin with the identification of those offenses immunized by the agreement, leaving all others for future prosecution.

This inquiry need not occupy us long, because the parties agree that as of October 20, 1989, the government did not have information on which to base a prosecution against Smith for any federal offense. It is not surprising that the government witnesses, therefore, testified that the nonprosecution clause of the use-immunity agreement was of no moment. From the government's point of view it was giving up nothing. As Assistant United States Attorney Feinberg said, "I feel he [Smith] is guilty. I have not been able to develop any information that he's guilty so we are not giving up anything." Assistant United States Attorney Wayne Rich testified:

> I don't know that it [the agreement] was illusory and meant nothing. What it meant was that we agreed not to use any information in our possession which was indicating that Mr. Smith had committed any crimes with inculpatory type information, and since we didn't have any, any information to that effect on October 20, 1989, we, the United States, were not giving up anything by including that provision. That's what it meant.

And from Smith's point of view, he was receiving the assurance that the government was not holding back a prosecution that it could later launch after it had obtained the benefits of his cooperative efforts.

In determining the proper interpretation of the agreement, it is also useful to understand what the agreement is not. All parties agreed, for instance, that it was not a full transactional immunity agreement, immunizing Smith for all crimes that he may have committed up to that point in time. Smith's attorney testified:

> Q: Will you agree with me, Mr. King, that that is not a blanket immunity for all offenses as of the date of this agreement?

> A: Yes.

> Q: And it's not a transactional immunity agreement in the sense that he is not going to be prosecuted for certain types of offenses, that is, tax offenses or extortion offenses or any other enumerated offenses; is that correct?

> A: I would characterize it as a nonprosecution agreement.

> Q: Well, my question—

> A: I characterize it as a nonprosecution agreement rather than a transactional immunity situation.

Smith's attorney went on to point out that a transactional immunity agreement would be broader than that which he actually obtained. The nonprosecution clause is also not an agreement to control the admissibility of evidence or information, or to immunize such information from introduction in any future prosecution. Evidence or information that could be evidence was not the object of the negotiations. Rather the agreement focused on the prosecution of *offenses:* "The United States will not *prosecute ... Mr. Smith for any federal offense....*" (Emphasis added.)

Again, Smith agrees. His attorney testified:

> [P]aragraph 3 [the nonprosecution clause] protects him [Smith] from *prosecution for any offense* based on information in possession of the government on or before the execution of the agreement, October 20, 1989.

(Emphasis added.)

On October 20, 1989, the government did know that Smith had filed tax returns over the years, had carried out duties of his office as a HUD manager under suspicious circumstances, and had indeed testified before the grand jury. But the known evidence of those activities did not support a prosecution for any federal offense. And about this, Smith agrees. When information subsequently came from a coconspirator to the attention of the government that Smith had committed federal offenses, the offenses could therefore be prosecuted, because they were not included in the specifically designated offenses for which immunity had been given.

The majority, overlooking as the object of the agreement the identified offenses for which the government could not prosecute, aimed at the "information-in-possession-of-the-government" language, observing that the word "information" is not qualified by the word "inculpatory," as found by the district court. I would submit that such an analysis is too narrow and fails to take into account the entire sentence. The sentence identifies "information" as that on which a prosecution could be *based*. While the word "inculpatory" is not used, that intent is certainly conveyed by the language.

The effect of the majority's interpretation of the nonprosecution clause is to provide Smith with transactional immunity, or more, and to preclude any future prosecution of Smith for virtually any federal offense, a result never intended by the parties. If Smith were to rob a federally insured bank tomorrow, the majority would have him immunized from prosecution, because the government had information as of October 20, 1989, that the bank was federally insured, a necessary element of federal bank robbery. Not even counsel for Smith has pressed for that interpretation, so conceding at oral argument.

### III

While I believe that the agreement was only intended to immunize "offenses" and not "information," the majority interpretation, if accepted, leads at most to an ambiguity, leaving the agreement open to interpretation based on extrinsic evidence. *See Hartman v. Blankenship*, 825 F.2d 26, 29 (4th Cir.1987) (recognizing the helpfulness of extrinsic evidence in interpreting the terms of an ambiguous plea agreement). The district court took evidence about intent and found as a fact that the parties did not intend to immunize the offenses of which Smith was convicted in this case. The court's findings are consistent with at least some of the testimony. For example, Assistant United States Attorney Rich, who negotiated the agreement on behalf of the government, testified that the agreement intended to provide that "any infor-

mation we [the government] had *that showed criminal wrongdoing* by Carl Smith wouldn't be used against him." He also testified about the intent that "we [the government] wouldn't use any inculpating information we had in our office against Mr. Smith. And, in fact, since we didn't have any, as Ms. Feinberg indicated, we weren't giving up anything."

Our scope of review of the district court's factual findings is narrow, and when those findings are supported by substantial evidence, as in this case, we must affirm.

I therefore strongly, but respectfully, dissent.