UNITED STATES of America,

v.

**Sorenson O. ORUCHE, Defendant.**

No. 01–287(EGS).

United States District Court,
District of Columbia.

April 16, 2003.

Kenneth F. Whitted, Assistant United States Attorney, Washington, DC, for Plaintiff.

Preston Burton, Caplin & Drysdale, Chartered, Washington, DC, for Defendant.

## *MEMORANDUM OPINION*

WALTON, District Judge.

This matter comes before the Court on a petition entitled Defendant's Motion to Reconsider *Kastigar* Remedy Pursuant to Subsequent D.C. Circuit Authority ("Def.'s Mot."), filed on January 23, 2003, following the defendant's conviction.[1] Prior to the defendant's trial, this Court conducted a hearing to determine whether a *Kastigar* evidentiary hearing was necessary in light of the defendant's contention that the government improperly used inculpatory statements that he made to the prosecutor during a debriefing that was conducted after he received an informal grant of immunity from the government. *See Kastigar v. United States*, 406 U.S. 441, 460, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) (once a defendant has been compelled to testify pursuant to a grant of immunity, the government has the burden of establishing that the evidence was derived from a source independent of the defendant's statements); *United States v. Kilroy*, 27 F.3d 679, 683 (D.C.Cir.1994) ("*Kastigar* ... provides the framework for analysis applicable to prosecutions of previously im-

munized witnesses: for a prosecution to proceed over the objection of an immunized witness, the court must hold a hearing in which the 'heavy burden' is on the government to demonstrate 'that it obtained all of the evidence it proposes to use [or has used] from sources independent of the compelled testimony.' ") (quoting *United States v. North*, 910 F.2d 843, 854, *reh'g granted in part*, 920 F.2d 940 (D.C.Cir. 1990), *cert. denied*, 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991)). At the conclusion of this hearing, the Court determined that while the defendant's attorney at the time of the debriefing had given the defendant incorrect advice as to the scope of the immunity he had been granted, a *Kastigar* hearing was nevertheless unnecessary. The Court reached this conclusion because although it found that the defendant's waiver of his Fifth Amendment privilege against self-incrimination, as related to the government's ability to use information it derived from the statements he made during the debriefing, was not knowing or intelligent, this defect in the waiver was solely the product of his attorney's incorrect advice that his statements could not be used against him in any manner. Thus, the Court reasoned at that time that there was no remedy available to the defendant under *Kastigar*, even assuming *arguendo* that the government used the information the defendant provided to acquire other inculpatory information that the government intended to use in its prosecution of the defendant, which the government denies was the case. The defendant's motion for reconsideration has led the Court to re-examine the language of the debriefing agreement, which informally purported to grant the defendant

1. This matter initially came before this Court upon the request of the judge who subsequently presided over the trial (Judge Sullivan), for this Court to address the defendant's pretrial motion for a *Kastigar* hearing, so that Judge Sullivan would not be potentially prejudiced by information revealed during the hearing in the event the parties opted to have a non-jury trial before Judge Sullivan, as they had indicated they were inclined to do.

only use immunity regarding the statements that he made during his debriefing, and the Court now concludes that the language of this debriefing agreement, coupled with the incorrect advice given to the defendant by his attorney about the scope of this grant of informal immunity, requires that a *Kastigar* hearing be conducted.[2]

### I. *Factual Background*

The events giving rise to the issues now before this Court began on July 16, 2001, when the defendant was arrested and charged with criminal offenses involving the possession and distribution of heroin. Government's Memorandum in Opposition to Defendant's Motion to Reconsider *Kastigar* Remedy ("Gov't.Mem.") at 1. Several weeks later, on July 30, 2001, the defendant participated in a debriefing session with government officials pursuant to a Debriefing Letter that had been drafted by the government,[3] which states, in pertinent part:

(1) First, except for paragraphs two and three below, no statements made by or other information provided by your client during the "off-the-record" debriefing(s) will be used directly against your client in any criminal proceeding.

(2) Second, the government may make derivative use of and may pursue any investigative leads suggested by any statements made by or other information provided by your client. (This provision is necessary in order to eliminate the necessity for a *Kastigar* hearing at which the government would have to prove that the evidence it would introduce at trial is not tainted by any statements made by or other information provided by your client.)

Def.'s Mot., Exhibit ("Ex.") A. The defendant alleges that during the debriefing session he "admitted to having participated in illicit activities with an individual previously unknown to the prosecutor in this case ... who [subsequently] testified at trial and before the grand jury ..." and that as a result of his statements the government was able to charge him with additional crimes. Def.'s Mot. at 3. The government, however, disputes this contention and represents that it knew about the witness prior to the debriefing and that any evidence used to obtain the indictments[4] and used at the defendant's trial was acquired independent of the statements made by the defendant during the debriefing session. Gov't. Mem. at 13–14.

In February 2002, as mentioned above, this Court conducted an evidentiary hearing during which the defendant's counsel at the time of the debriefing session, Stanley Foshee, testified. Mr. Foshee, who had been replaced as the defendant's attorney by the Court, testified that he discussed the contents of the Debriefing Letter with the defendant prior to the debriefing session for "no less than a half hour and no more than an hour." Def.'s Mot., Ex. B (Transcript Testimony of Stanley Foshee) at 8. With regard to

---

2. A *Kastigar* hearing can be conducted pretrial, mid-trial, or post-trial. *See Kilroy,* 27 F.3d at 686–87 (citing *North,* 910 F.2d at 859).

3. The Debriefing Letter is dated July 25, 2001 and was signed by the defendant and his attorney on July 30, 2001.

4. After several superceding indictments, the defendant was ultimately charged with one count of conspiracy to possess with the intent to distribute and distribute 1000 grams or more of heroin, 21 U.S.C. § 846, two counts of distribution of 100 grams or more of heroin, 21 U.S.C. § 841(a)(1), two counts of distribution of heroin, 21 U.S.C. § 841(a)(1), and four counts of unlawful interstate travel in aid of racketeering, 18 U.S.C. § 1952(a)(3). Gov't. Mem. at 2.

paragraph (2) of the Debriefing Letter, which addressed the topic of "derivative use" and sought to qualify paragraph (1) which indicated that the defendant's debriefing statement would not "be directly used against [him] in any criminal proceeding[,]" Mr. Foshee testified that he told the defendant:

> 'Derivative Use' meant that the statements that he made to the government, if they contained information of criminal activity that was or was not the subject matter of this particular case and did or did not involve him, that the government could take that information, investigate that information, and if it developed, they could bring charges against him for that information that contained criminal activity that he may have participated in.

*Id.* at 11. Mr. Foshee also testified that he had recently reviewed notes that he had purportedly made on his copy of the Debriefing Letter when he had explained the contents of the immunity agreement to the defendant, and his notes indicated he informed the defendant that "the 'derivative use' issue indicates that the government may pursue any investigative leads per any statements that the defendant gives ... [,]" which he asserted corroborates his recollection of his explanation of 'derivative use.' *Id.* at 14. Mr. Foshee stated that he went through the contents of the letter with the defendant several times prior to the debriefing session "because [he] wanted to make sure that [the defendant] understood what [he] was talking about." *Id.* at 15–18.

However, the Court was highly suspect about the accuracy of Mr. Foshee's testimony because it directly conflicted with the position he had taken at an earlier

hearing.[5] During the earlier hearing on January 24, 2002, when Mr. Foshee was still representing the defendant, he had argued to the Court that "*we assumed,* your honor, that any information or evidence will—given by my client at that time would not be used against him in terms of it showing up as an actual charge in a superseding indictment as it has done." *Id.* at 25 (emphasis added). Mr. Foshee also stated at that time that "*we interpreted* the language in 2 and 3 [of the Debriefing Letter] as to indicate—first of all, *we assumed* that nothing he provided in those debriefings would be used against him in any shape, form or fashion." *Id.* at 27 (emphasis added). Mr. Foshee further explained that his "client was under the impression, first of all, that anything he told them would not be used against him in any shape, form or fashion. The derivative use of the information that he provided he thought would be provided as it related to other people." *Id.* at 27–28.

When questioned about the inconsistency between the position he was taking at the February hearing regarding what he allegedly informed the defendant prior to the debriefing session about what "derivative use" meant, as compared to the position that he had taken earlier at the January hearing on the same subject, Mr. Foshee simply explained that he "misspoke" at the earlier hearing when he used the term "we" when indicating what he intended to convey about his client's understanding of the Debriefing Letter. *Id.* at 29–34. He further alleged that at the earlier hearing he was merely advocating on behalf of his client and attempting to advance his client's position, and that he had in fact given the defendant a correct interpretation of the term "derivative use."

---

**5.** The Court was so troubled by the testimony and the overall events of this case that it forwarded a complaint concerning Mr. Foshee to the District of Columbia Bar Counsel's office.

*Id.* In response to the Court's observation that "the responses that [he] gave at the last hearing at least suggested that [he] had an interpretation of the agreement consistent with [the defendant's,]" which was glaringly incorrect, Mr. Foshee responded

> Yes, I understand that, your honor. And that's what I am saying. After I reflected on that incident, I went back and consulted my notes that I had done in the debriefing session with [the defendant], the explanation of the letter. What I guess I did was to assume the posture that he had taken at the time I made the statements to the Court, but, in actuality, at the time that I interviewed [the defendant] and explained the contents of the debriefing letter, it was to tell him the things that I indicated earlier in this session about how the information could be used against him. And I felt that he understood that because he said he understood it.

*Id.* at 32. On this point, the Court finds it important to note that on redirect examination of Mr. Foshee, the defendant's new attorney returned to the notes that Mr. Foshee had allegedly made on the Debriefing Letter while explaining it to the defendant, and which Mr. Foshee allegedly relied upon to refresh his memory about what exactly he explained to the defendant about this agreement. These notations, according to Mr. Foshee, indicated that he explained that "the 'derivative use' issue indicates that the government may pursue any investigative leads per any statements that the defendant gives ..." *Id.* at 14. The defendant's new attorney, however, pointed out that the notations that were made on the Debriefing Letter were from two different pens, as demonstrated by two different ink colors, and he argued that Mr. Foshee had actually added some of the notations at some point after the meeting with the defendant. *Id.* at 59–60.

The defendant also testified during the evidentiary hearing. He began by stating that he was born in Nigeria, that he came to this country in 1986, and that he went to Texas Southern University for two years. Def.'s Mot., Ex. B (Transcript Testimony of Sorenson Oruche) at 11. The defendant stated that Mr. Foshee explained to him that paragraph (1) of the Debriefing Letter indicated that "anything that [the defendant] said in th[e] debriefing [was] off the record and nothing that [he] said would be used against [him] in anything at all." *Id.* at 15. With regards to paragraph (2) of the Debriefing Letter, which contained the "derivative use" language, the defendant testified that he had difficulty understanding its language and that he "was concerned about a Kastigar hearing and derivative use of information." *Id.* He then stated that as a result of his discussions with Mr. Foshee, he understood that the only limitations on the immunity he had been granted was that if he changed his testimony during future proceedings when he was providing assistance to the government in connection with the investigation of other individuals, the government could prosecute him for changing his testimony. Otherwise, the defendant said Mr. Foshee told him that the government would not use the statements against him. *Id.* at 16–18. He also stated that Mr. Foshee led him to believe that a *Kastigar* hearing described what amounted to a bench conference during a trial to determine the admissibility of evidence. *Id.* at 16.

The Court held at the conclusion of the evidentiary hearing that the defendant's waiver of his Fifth Amendment privilege against self-incrimination was not knowing and intelligent because his statements were the product of incorrect advice given by his attorney. The Court also held that his statements were made voluntarily, and

thus, the defendant was not entitled to a *Kastigar* hearing. The defendant now seeks reconsideration of the Court's previous ruling based on a recent ruling by the District of Columbia Circuit in *United States v. Hylton,* 294 F.3d 130 (D.C.Cir. 2002).

## II. *Legal Analysis*

### (A) *The District of Columbia Circuit's Hylton Opinion*

In *Hylton,* following the defendant's arrest and indictment, he also participated in a debriefing with the government pursuant to a "Debriefing Agreement" that apparently contained the same two paragraphs that are at issue in the Debriefing Letter in this case. *Id.* at 132. During the debriefing session in *Hylton,* the defendant provided general information to the government regarding his own conspiratorial conduct and more specific information regarding the conduct of his co-conspirator. *Id.* Prior to Hylton's trial, he filed a motion to exclude all evidence derived from his debriefing session. *Id.* The trial judge determined that although Hylton's "statements were voluntary, his waiver of his Fifth Amendment rights was not a 'knowing and intelligent' act. (Hylton claimed that his participation was based on his understanding that he would be released from custody.)" *Id.* The government did not appeal the trial court's ruling and the parties and the trial court proceeded with the notion that a *Kastigar* hearing was legally required. *Id.* However, the actual need for a *Kastigar* hearing "was avoided [ ] because [defense] counsel stipulated that the government had independent knowledge of several proposed witnesses but not one of the drug couriers ... whom the government ... agreed not to call." *Id.* In addition, the prosecutor indicated that although the government had not known about the co-conspirator's involvement prior to the debriefing, his "where-abouts were unknown and [that because] the government did not intend to call him no formal stipulation as to him was entered." *Id.* However, following a not guilty verdict on some counts and a hung jury on the other counts at Hylton's first trial, the defendant was convicted at a second trial with the presentation of "one significant addition [of proof,]" the presentation of the co-conspirator's testimony. *Id.* at 133.

Following Hylton's guilty verdict in the second trial, the defendant's newly appointed counsel filed a motion for a new trial based on several grounds, including a claim of ineffective assistance of counsel because the defendant's counsel at his second trial had failed to object to the co-conspirator testimony. *Id.* The trial judge denied the defendant's motion following a *Kastigar* hearing, finding that the government was aware of the co-conspirator's identity and role prior to the defendant's debriefing, and thus, defense counsel was not ineffective in failing to object to the co-conspirator's testimony since he believed that the government knew about the co-conspirator before the debriefing. *Id.* On appeal, the District of Columbia Circuit reversed Hylton's conviction because it concluded that the defendant was denied effective assistance of counsel due to his counsel's failure to raise the *Kastigar* issue with respect to the testimony of the co-conspirator. *Id.* at 136. The Circuit Court's reversal was premised on what it considered to be defense counsel's "misunderstanding of *Kastigar.*" *Id.* at 134. This was the Circuit Court's conclusion because the government's knowledge about the co-conspirator was not the sole factor defense counsel should have considered in deciding whether to challenge his testimony. *Id.* Rather, the Court held that defense counsel should have objected to the co-conspirator's testimony so that he

could have explored with him outside of the presence of the jury whether his decision to testify was influenced or coerced with the use of Hylton's debriefing statement, *id.*, as was alleged by Hylton's new attorney, *id.* at 133.

Although the defendant relies heavily on *Hylton* as the legal basis for his position that he is entitled to a *Kastigar* hearing, actually, *Hylton* is of no assistance to him. In *Hylton*, the government attempted to challenge for the first time on appeal the trial court's ruling that "the *Kastigar* framework ..." was applicable to Hylton's claim that he did not knowingly and intelligently waive his privilege against self-incrimination, arguing that because, as the trial court had ruled, Hylton's "statement was unquestionably voluntary ..." he was "not entitled to the full *Kastigar* protection against *derivative* use." *Id.* at 135 (emphasis in the original). The Circuit Court, however, concluded that this "sophisticated" and "interesting" challenge by the government came "too late to be considered" because "under th[e] circumstances [the trial court's ruling on] *Kastigar's* applicability became the law of the case." *Id.* (citing and quoting *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 250 (D.C.Cir. 1987)) ("A 'legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time.' "). Thus, the Circuit Court's decision in *Hylton* failed to address whether *Kastigar* actually has applicability to evidence derived from a defendant's voluntary statement that was not the product of a knowing and intelligent waiver of the defendant's Fifth Amendment privilege against self-incrimination.

**(B)** *Is the Defendant Entitled to a Kastigar Hearing?*

The Fifth Amendment to the Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself ..." U.S. Const. amend. V. This privilege against self-incrimination rests on the "long-recognized principle that a predicate to liberal constitutional government is the freedom of a citizen from government compulsion to testify against himself." *North*, 910 F.2d at 853. So important was this freedom that the privilege against self-incrimination, "which in England was a mere rule of evidence, became clothed in this country with the impregnability of a constitutional enactment" by the framers of the Constitution. *Id.* (quoting *Brown v. Walker*, 161 U.S. 591, 597, 16 S.Ct. 644, 40 L.Ed. 819 (1896)). The District of Columbia Circuit explained that

> [b]ecause the privilege against self-incrimination reflects many of our fundamental values and most noble aspirations, and because it is the essential mainstay of our adversary system, the Constitution requires that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth.

*Id.* (internal quotations and citations omitted).

Immunity issues generally arise in two contexts, either when an individual refuses to testify before a grand jury or at a trial on Fifth Amendment grounds and is given a formal order of immunity under 18 U.S.C. § 6002 (2000), or when the government has granted a person varying degrees of immunity pursuant to an informal agreement. *United States v. Plummer*, 941 F.2d 799, 802 (9th Cir.1991). This Court is

presented with the latter situation because the defendant agreed to waive his Fifth Amendment privilege against self-incrimination in exchange for what was purported to be a limited grant of immunity pursuant to the informal agreement contained in the Debriefing Letter. It is well understood that "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) (citations omitted). "A waiver is voluntary in the absence of coercion, *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), and is knowing if made 'with the full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *United States v. Krilich,* 159 F.3d 1020, 1026 (7th Cir. 1998) (quoting *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)); *see also United States v. Ready,* 82 F.3d 551, 557 (2d Cir.1996) (a waiver is only knowing or 'informed' if the defendant "fully understood the consequences of the waiver."); *United States v. Rutan,* 956 F.2d 827, 830 (8th Cir.1992) (same); *United States v. Baty,* 980 F.2d 977, 979 (5th Cir.1992), *cert. denied,* 508 U.S. 956, 113 S.Ct. 2457, 124 L.Ed.2d 672 (1993) (same). The scope of the immunity granted to the defendant in exchange for his waiver of the privilege against self-incrimination is of paramount importance to the Court's analysis of *Kastigar's* applicability. In *United States v. Dudden,* 65 F.3d 1461 (9th Cir. 1995), the Ninth Circuit provided a concise explanation about the differences between what is referred to as use immunity and derivative use immunity.[6] The court explained that:

> 'Use immunity' means that the compelled statements cannot be used against the defendant. 'Derivative use immunity' means that the government must derive all the information used as the basis for any prosecution of the defendant from sources wholly independent of the defendant's statements. The government may not use the statements to uncover other incriminating evidence, focus the investigation, decide to initiate prosecution, interpret other evidence, or otherwise plan trial strategy.

*Id.* at 1467 (citations omitted). Thus, the Court will conduct its analysis of the immunity agreement at issue by examining whether the defendant's waiver of his Fifth Amendment privilege was done with the full understanding of the limited scope of immunity that was purportedly being granted by the government.

 Turning to the informal immunity agreement in this case, the Court finds it appropriate to begin its analysis by noting that "the immunity agreement defines the extent of the immunity granted to the defendant and Fifth Amendment principles define the protection to be afforded the defendant within the scope of the granted immunity." *United States v. McFarlane,* 309 F.3d 510, 514 (8th Cir.2002). To determine the extent or scope of the immunity granted by the informal agreement here, it is universally recognized that such agreements are typically interpreted using ordinary contract principles. *See Kilroy,* 27 F.3d at 684 (quoting *United States v. Pollard,* 959 F.2d 1011, 1022 (D.C.Cir. 1992)) ("addressing a grant of 'retrogressive use immunity' in the context of a plea

---

**6.** While not at issue in this case, the Court notes that there is a third category of immunity, what is commonly referred to as 'transactional immunity.' "Transactional immunity is full immunity from prosecution for any offense to which the testimony relates." *Plummer,* 941 F.2d at 803 (citing *Kastigar,* 406 U.S. at 453, 92 S.Ct. 1653).

agreement and stating "a plea agreement is a form of contract."); *see also United States v. Conway,* 81 F.3d 15, 17 (1st Cir. 1996); *United States v. Aleman,* 286 F.3d 86, 89–90 (2d Cir.2002) ("[w]e interpret [immunity] agreements according to principles of contract law . . ."); *United States v. Cantu,* 185 F.3d 298, 302 (5th Cir.1999) ("we interpret [non-prosecution] agreements in accordance with general principles of contract law."); *United States v. Andreas,* 216 F.3d 645, 663 (7th Cir.2000) (recognizing that "[i]mmunity agreements, like plea bargains, are interepreted as ordinary contracts . . ."); *McFarlane,* 309 F.3d at 514 ("an immunity agreement is likened to a contract between the government and the defendant, a concept universally recognized by courts faced with enforcing such agreements."); *Dudden,* 65 F.3d at 1467 ("We interpret informal immunity agreements using ordinary contract principles."); *United States v. Nyhuis,* 8 F.3d 731, 742 (11th Cir.1993), *cert. denied,* 513 U.S. 808, 115 S.Ct. 56, 130 L.Ed.2d 15 (1994) ("Plea agreements are interpreted and applied in a manner that is sometimes likened to contractual interpretation."). This correlation with contract principles has been employed because, as the Eighth Circuit explained in *McFarlane,*

> [a]bsent coercion by the government which is not here alleged, the defendant is not compelled to enter the agreement, but is a party to a bargained-for-exchange. The government gains information with which to prosecute other criminals, and the defendant receives the government's promise not to use the information against the defendant, depending on the specifics of the particular agreement.

309 F.3d at 514.

The Fourth Circuit, however, has commented that "[i]n interpreting immunity agreements, as with plea agreements, we must be mindful of the fact that 'the defendant's underlying 'contract' right is constitutionally based and therefore reflects concerns that differ fundamentally from and run wider than those of commercial contract law.'" *United States v. Smith,* 976 F.2d 861, 863 (4th Cir.1992) (quoting *United States v. Harvey,* 791 F.2d 294, 300 (4th Cir.1986) (citing *Mabry v. Johnson,* 467 U.S. 504, 509, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984) (cited by *Harvey* for the proposition that a "broken government promise that induced guilty plea implicates due process clause because it impairs involuntariness and intelligence of plea."))). Moreover, like plea agreements, when immunity agreements are at issue, "the courts' concerns run even wider than protection of the defendant's individual constitutional rights—to concerns for the 'honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government.'" *Harvey,* 791 F.2d at 300 (quoting *United States v. Carter,* 454 F.2d 426, 428 (4th Cir.1972)). In *Harvey,* the Fourth Circuit explained that

> [p]rivate law interpretitive principles may be wholly dispositive in an appropriate case. For example, whether a written agreement is ambiguous or unambiguous on its face should ordinarily be decided by the courts as a matter of law. If it is unambiguous as a matter of law, and there is no suggestion of government overreaching of any kind, the agreement should be interpreted and enforced accordingly. Neither side should be able, any more than would be private contracting parties, unilaterally to renege or seek modification simply because of uninduced mistake or change of mind. Such an approach is conformable not only to the policies reflected in private contract law from which it is directly borrowed, but also to constitutional

concerns of fundamental fairness ... and to the wider concerns expressed in the exercise of supervisory jurisdiction over the administration of federal criminal justice.

On the other hand, both constitutional and supervisory concerns require holding the Government to a greater degree of responsibility than the defendant (or possibly than would be either of the parties to commercial contracts) for imprecisions or ambiguities in plea agreements. This is particularly appropriate where, as will usually be the case, the Government has proffered the terms or prepared a written agreement—for the same reasons that dictate that approach in interpreting private contracts.

791 F.2d at 300–01 (internal citations omitted). Thus, it is well understood that "[d]ue process not only 'requires that the government adhere to the terms of any plea agreement or immunity agreement it makes,' but also requires [the court] to construe agreements strictly against the government in recognition of its superior bargaining power ..." *Aleman*, 286 F.3d at 90 (quoting *United States v. Pelletier*, 898 F.2d 297, 302 (2d Cir.1990) (citations omitted)); *see also Dudden*, 65 F.3d at 1467 ("If there is any ambiguity in the language of the immunity agreement, the ambiguity will be resolved against the government."); *Rowe v. Griffin*, 676 F.2d 524, 526 n. 4 (11th Cir.1982) ("Ambiguity over the terms of such a promise [of immunity] should be resolved in favor of the criminal defendant.").

Pursuant to District of Columbia contract law, "[t]here must ... be an honest and fair 'meeting of the minds' as to all issues in a contract." [7] *Simon v. Circle Assoc.*, 753 A.2d 1006, 1012 (D.C.2000) (citing *Estate of Taylor v. Lilienfield*, 744 A.2d 1032, 1035 (D.C.2000)). The District of Columbia Court of Appeals explained that "the parties to a putative contract must intend the words and acts which constitute their manifestation of assent ... [as the District of Columbia] adhere[s] to the 'objective law' of contracts, meaning that the language of the agreement as it is written governs the obligations of the parties unless that language is unclear ..." *Id.* (citing *Capital City Mortgage Corp. v. Habana Vill. Art and Folklore, Inc.*, 747 A.2d 564, 567 (D.C.2000); *Hart v. Vermont Inv. Ltd. P'ship.*, 667 A.2d 578, 582–83 (D.C.1995)). With these principles in mind, the Court will turn to the instant case and make a "factual inquiry ... to determine whether the parties intended a different meaning than is facially suggested." *Smith*, 976 F.2d at 864 (citing Re-

---

**7.** The Court deems it appropriate to apply District of Columbia contract law because the immunity agreement was drafted and executed here. *See, e.g., Andreas*, 216 F.3d at 663 n. 5 (Seventh Circuit noting that federal courts look to general principles of contract law to interpret a plea or immunity agreement[,] and applying Illinois law, "which fairly typifies the general law of contracts and is persuasive in this instance."). Pursuant to District of Columbia choice-of-law rules, when a contract is silent as to "which law governs their agreement, [as is the situation here,] the Restatement approach requires the court to weigh various jurisdictions' contacts with the transaction at issue and to determine which has the most substantial interest in the mat-

ter." *See Ideal Elec. Sec. Co. v. Int'l Fid. Ins. Co.*, 129 F.3d 143, 148 (D.C.Cir.1997) (citing Restatement (Second) of Conflict of Laws § 188). And Restatement (Second) § 188 states that in the absence of an "effective choice of law by the parties ... the contacts to be taken into account" include:

(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

In this case, it is clear that the District of Columbia is the only jurisdiction that has any contacts with the immunity agreement.

statement (Second) of Contracts § 214(c) & cmt. b (1979); *id.* § 212; 3 Corbin on Contracts § 542, at 111).

The Debriefing Letter in this case clearly gave the defendant use immunity for any statements made during his debriefing with the government, providing that "except for [what was set forth in] paragraphs two and three below, no statements made by or other information provided by [the defendant] during the 'off-the-record' debriefing(s) [would] be used directly against [the defendant] in any criminal proceeding." *See* Def.'s Mot., Ex. A ¶ 1. The second paragraph referenced in this agreement states that:

> the government may make derivative use of and may pursue any investigative leads suggested by any statements made by or other information provided by [the defendant]. (This provision is necessary in order to eliminate the necessity for a *Kastigar* hearing at which the government would have to prove that the evidence it would introduce at trial is not tainted by any statements made by or other information provided by [the defendant].)

*Id.* ¶ 2. While this second paragraph was an attempt to convey that the defendant was not being granted derivative use immunity regarding any statements made during his debriefing, the Court is troubled that the language the government chose to use was not sufficiently clear and unambiguous that a layperson, such as the defendant, would be able to comprehend the limitation it was placing on the grant of immunity that was conferred in the preceding paragraph. Had the defendant received accurate legal advice from his attorney prior to the debriefing regarding the scope of immunity being granted by the Debriefing Letter, any potential misconceptions about the scope of immunity due to the agreement's lack of clarity would presumably have been ameliorated.[8] But, this was not the case, as the Court credits the defendant's testimony that his attorney advised him that what he said during the debriefing could not be used against him in any manner.

The language the government chose to utilize in its Debriefing Letter to indicate that the defendant was being granted only use immunity, and not also derivative use immunity, is ambiguous to the degree that this Court concludes that a layperson, faced with the incorrect advice given by the defendant's prior attorney, would rea-

---

**8.** The Court notes that its decision is limited to the facts before it, which is a situation where the defendant's failure to understand the immunity agreement because of its lack of clarity was exacerbated by incorrect advice having been provided by the defendant's attorney regarding the scope of the immunity being granted. These events collectively, the Court concludes, reasonably led the defendant to believe that he was being granted both use and derivative use immunity. The Court wants to make perfectly clear that it is not deciding that the immunity agreement in this case is *per se* ambiguous and that the agreement, in and of itself, necessitates a *Kastigar* hearing. As the Fourth Circuit stated in *Harvey*,

> [t]his does not mean that in a proper case it might not be possible to establish by extrin-

sic evidence that the parties to an ambiguously worded plea [or immunity] agreement actually had agreed-or mutually manifested their assent to-an interpretation as urged by the Government. But here, that evidence simply does not exist. On the contrary, as has been developed, the evidence shows at most an honest conflict of understandings and intentions that is best explained by the ambiguity itself.

791 F.2d at 303. That being said, the Court would suggest to the government that it should consider amending the language of its Debriefing Letter in a manner that ensures that a layperson would sufficiently understand the constitutional rights he or she is waiving by participating in a debriefing session with the government.

sonably believe that any statements he made during the debriefing session could not be used against him in any fashion. As mentioned above, the immunity agreement begins by informing the defendant that the government will not use any statements made during the "off-the-record" debriefing sessions directly against him.[9] This expansive grant of immunity is only qualified by the subsequent two paragraphs. The paragraph at issue in this case begins by stating that "the government may make derivative use of and may pursue any investigative leads suggested by any statements made by or other information provided by your client." *See* Def.'s Mot., Ex. A, ¶ 2. To understand this sentence, one must understand what derivative use means. And while competent counsel would be able to explain to a client the meaning of derivative use, without such advice, a layperson cannot be expected to comprehend the term. Although the derivative use language is followed by the statement that the government "may pursue any investigative leads[,]" this language does not fully convey the potential consequences a suspect may suffer by participating in the debriefing session. In other words, it is one thing to say that one's statements can be used as the basis for conducting further investigation, it is quite another to say that if additional evidence is acquired with the use of one's statement that the additional evidence can be used as the basis for charging the person with other crimes and then using that evidence against the person at trial.

In response to the Court's concern about the derivative use sentence's lack of clarity, the government at the hearing on the defendant's motion for reconsideration re-

sponded by noting that this sentence is followed immediately by the additional explanation that "[t]his provision is necessary in order to eliminate the necessity for a *Kastigar* hearing at which the government would have to prove that the evidence it would introduce at trial is not tainted by any statements made by or other information provided by your client." This attempt to clarify the derivative use sentence was unsuccessful. To understand this explanation, a layperson would have to know what a *Kastigar* hearing is and why such hearings are necessary. While the language would be a "red flag" to a competent criminal defense attorney that a client is only being granted use immunity, this sentence does nothing to convey to a layperson that the government can utilize his statements to discover other evidence that may be used against him. Moreover, use of the term "tainted" would only potentially add confusion to a layperson's lack of understanding of the derivative use language because without an understanding of *Kastigar*, a layperson would be unable to draw a correlation between the statements he provided and the ability of the government to use evidence that was acquired through the use of those statements. Therefore, the Court concludes that the lack of clarity in the Debriefing Letter with respect to the limited scope of the immunity being granted to the defendant, coupled with what amounted to ineffective advice by the defendant's counsel, led the defendant to reasonably believe that he was being granted both use and derivative use immunity.

The government's opines that it should not be penalized for what amounts to inef-

---

9. Although the Court does not conclude that the first paragraph of the agreement granting the defendant use immunity is ambiguous, the Court notes that other courts have found the term "off-the-record" to be an ambiguous phrase. *See United States v. Lyons,* 670 F.2d 77, 80 (7th Cir.1982) (quoting the trial court's conclusion that "[a]mbiguous phrases such as 'off-the-record' should not be used.").

fective assistance on behalf of the defendant's prior attorney. However, the Court's conclusion that the defendant's waiver of his Fifth Amendment privilege against self-incrimination was not a knowing and intelligent act, is based not only upon the incorrect advice given by the defendant's attorney, but also on the government's failure to utilize precise and unambiguous language in its immunity agreement. On this point, the Court finds the Fourth Circuit's decision in *Harvey* particularly instructive. In *Harvey*, the Fourth Circuit was faced with circumstances where a defendant had entered into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia, which stated that "[t]he Eastern District of Virginia further agrees not to prosecute [the defendant] for any other possible violations of criminal law arising from the offenses set out in the indictment or the investigation giving rise to those charges." 791 F.2d at 296 n. 1. Following the defendant's incarceration for the offenses he pled guilty to in Virginia, he was arrested on charges contained in a federal indictment issued in South Carolina that were related to the federal indictment to which the defendant had pled guilty in Virginia. *Id.* at 297. The defendant subsequently filed a motion in Virginia to enforce the plea agreement by enjoining his South Carolina prosecution. As grounds for his motion, the defendant asserted that the plea agreement was not only ambiguous, but that he had been led to believe by the government that "the agreement would 'put behind him' all of [his] possible exposure to criminal liability for all violations 'arising from' the general investigation leading to his indictment." *Id.* at 297–98. The district court reluctantly denied the defendant's motion on legal grounds, finding that the " 'narrowly drawn' plea agreement did not bar the South Carolina prosecution." *Id.* at 299

(specifically, the trial judge stated that it was "a painful experience ... to have to deny [the defendant] relief ... [because it was the Court's] hope that he had criminal activity out of his life and ... [that he] personally hope[d] the Government will [dismiss] the case against him in South Carolina."). The district court pointed out that the defendant's attorney was "obviously experienced and knew exactly what was going on," and thus the court would have to enforce the language of the plea agreement as negotiated. In reversing the decision of the district court, the Fourth Circuit, as this Court mentioned above, stated that in drafting the language of a plea agreement "the Government [is held] to a greater degree of responsibility than the defendant ... for imprecisions or ambiguities in plea agreements." *Id.* at 300 (citations omitted). Of significance to the instant case, is the Fourth Circuit's discussion regarding the interrelationship between "derelictions on the part of defense counsel" and ambiguities contained in plea agreements. The Court stated:

[a]s a necessary corollary, derelictions on the part of defense counsel that contribute to ambiguities and imprecisions in plea agreements may not be allowed to relieve the Government of its primary responsibility for insuring precision in the agreement. While private contracting parties would ordinarily be equally chargeable—so far as enforceability and interpretation are concerned—with their respective counsels' derelictions in negotiating commercial contracts, different concerns apply to bargained plea agreements. Unlike the private contract situation, the validity of a bargained guilty plea depends finally upon the voluntariness and intelligence with which the defendant—and not his counsel—enters the bargained plea. This necessary condition to effective waiver of constitution-

al rights can be found wanting not only because of the Government's derelictions in discharging its duty of fair bargaining, but also because of any independent (as well as Government-induced) dereliction of defense counsel amounting to ineffective assistance of counsel.

*Id.* at 301 (internal citations omitted). Thus, even in the face of the incorrect advice provided by the defendant's attorney, the government must bear the consequences of its ambiguous immunity agreement.

While courts typically utilize the same analysis in interpreting the scope of both immunity and plea agreements, *see Smith*, 976 F.2d at 863, there is a compelling reason why it is even more important for the government to be absolutely clear and unambiguous in immunity agreements it drafts. As the District of Columbia Circuit noted, "[a] plea agreement is a form of contract, ... it is a rather unusual contract, because the judge plays an active role in overseeing its performance ... [and] review[s] and accept[s] the agreement and observe[s] both parties' conduct under the agreement[.]" *Pollard*, 959 F.2d at 1022 (citing Fed.R.Crim.P. 11(e)). Immunity agreements, on the other hand, are executed without judicial oversight of the defendant's understanding of the essential terms of the agreement, as they are not subject to the same type of judicial scrutiny required by Rule 11 of the Federal Rules of Criminal Procedure. This is all the more reason for the government to utilize language in its immunity agreements that convey a clear and unambiguous explanation about the scope of the immunity being granted to the defendant. This was not done here, and the government is not absolved of the consequences for failing to draft a clear and unambiguous agreement because of the defense counsel's gross ineffectiveness.

## III. *Conclusion*

For the foregoing reasons, the Court is simply unable to conclude that the defendant's waiver of his Fifth Amendment privilege against self-incrimination was done with the full understanding of the waiver's potential consequences. This conclusion is called for because the Court finds that the ambiguous language of the immunity agreement coupled with the incorrect advice provided by the defendant's counsel reasonably led the defendant to conclude that he was being given what in effect amounted to both use and derivative use immunity. An informal grant of immunity by the government will "presumptively include[ ] derivative use immunity, unless the government can demonstrate in a given case that, at the time the agreement was made, it expressly clarified that only direct use immunity was offered." *Plummer*, 941 F.2d at 805; *see Kilroy*, 27 F.3d at 685 (an informal agreement that provides a defendant with "use immunity," without specifying the scope, will "include[ ] derivative use immunity equivalent to that afforded by the [formal immunity] statute."). As was stated by another district court judge,

[w]hen the government seeks to obviate the privilege against self-incrimination, it should do so with greater care than was used here. Ambiguous phrases ... should not be used. The terms of [debriefing sessions] in which potentially incriminatory information is given by a person subject to investigation should be spelled out with particular clarity. When the government fails to do this, it is not unreasonable or unfair to hold that it should suffer the consequences of ambiguity.

*Lyons* 670 F.2d at 80 (quoting the district court judge). Therefore, because the Court finds that the defendant's waiver of his Fifth Amendment privilege against

self-incrimination was not a knowing or intelligent act, and as a result the Court must conclude that the government's informal grant of immunity included derivative use immunity, the Court holds that it must conduct a *Kastigar* hearing to determine whether the government utilized any statements made by the defendant during his debriefing session to acquire evidence that was used against him.[10]

## ORDER

Upon consideration of the Defendant's Motion to Reconsider *Kastigar* Remedy Pursuant to Subsequent D.C. Circuit Authority, and for the reasons set forth in the Memorandum Opinion accompanying this Order, it is hereby,

**ORDERED** that the defendant's motion for reconsideration is **GRANTED.** It is

**FURTHER ORDERED** that a Kastigar hearing will be conducted in this matter on June 3, 2003 at 11:00 a.m.

---

**10.** An Order consistent with the Court's ruling accompanies this Memorandum Opinion.